**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

LARRY DARNELL WILLIAMS,
Petitioner-Appellant,

v.

JAMES B. FRENCH, Warden, Central

Prison, Raleigh, North Carolina;
MICHAEL F. EASLEY, Attorney
General of North Carolina,
Respondents-Appellees.

No. 97-19

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Graham C. Mullen, District Judge.
(CA-83-204-3-MU)

Argued: March 2, 1998

Decided: May 18, 1998

Before HAMILTON, Circuit Judge, BUTZNER, Senior Circuit
Judge, and MOON, United States District Judge for the Western
District of Virginia, sitting by designation.

_____

Affirmed by published opinion. Judge Hamilton wrote the opinion, in
which Senior Judge Butzner and Judge Moon joined.

_____

**COUNSEL**

**ARGUED:** Sean Patrick Devereux, PITTS, HAY, HUGEN-
SCHMIDT & DEVEREUX, P.A., Asheville, North Carolina;

Anthony Lynch, Marion, North Carolina, for Appellant. Barry Steven McNeill, Special Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees. **ON BRIEF:** Michael F. Easley, Attorney General of North Carolina, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees.

_____

**OPINION**

HAMILTON, Circuit Judge:

Following a jury trial in the Superior Court for Gaston County, North Carolina, Larry Darnell Williams was convicted and sentenced to death for the murder of Eric Joines. He now appeals the district court's denial of his petition for a writ of habeas corpus. See 28 U.S.C. § 2254.**1** We affirm.

I

A

On the early morning of June 3, 1979, Eric Joines was robbed and shot in the back of his head at close range with a .20 gauge sawed-off shotgun. At the time he was shot, Joines was working the late shift at the Service Distributors station on Highway 321 North in Gastonia, North Carolina. As a result of his injuries, Joines died one week later.

_____

**1** Because Williams' petition for a writ of habeas corpus was filed on April 5, 1983, prior to the April 24, 1996 enactment of the Antiterrorism and Effective Death Penalty Act (AEDPA) of 1996, Pub. L. No. 104-132, 110 Stat. 1214, the Chapter 153 amendments of the AEDPA do not apply in this case. See Lindh v. Murphy , 117 S. Ct. 2059, 2068 (1997) (holding that the Chapter 153 amendments, amendments applying to all federal habeas petitions, do not apply to federal habeas petitions pending on the date of the AEDPA's enactment). As to the Chapter 154 amendments, amendments applying to capital petitioners, the State does not maintain that it has satisfied the opt-in requirements of Chapter 154 such that those provisions of the AEDPA apply.

2

At Williams' trial, two accomplices, Linda Massey and her cousin, Darryl Brawley, testified that on the night of June 2, 1979, Williams, Massey, Brawley, and an unidentified fourth person were riding around together in Charlotte, North Carolina in a car belonging to another of Massey's cousins, Robert Brown. Massey and Brawley also testified that Williams had a .20 gauge sawed-off shotgun with him in the car. After drinking alcohol, smoking marijuana, and taking Valium during the course of the evening, the group traveled on Interstate 85 from Charlotte to Gastonia. The group got off at an exit in Gastonia and traveled past the station where Joines worked. Shortly thereafter, the group returned to the station, where Williams and the unidentified fourth person got out of the car, with Williams armed with his sawed-off shotgun, and entered the station and robbed Joines of approximately $274. Williams then ordered Joines to lie face down on the floor. Following Joines' compliance with Williams' order, Williams shot Joines in the back of his head.

After the Joines shooting, the group traveled to Concord, North Carolina, where they stopped at a "7-11" convenience store. Williams and the unidentified fourth person got out of the car and entered the store. Shortly thereafter, Williams returned to the car, got his sawed-off shotgun, and went back into the store where he robbed and fatally shot the store clerk, Susan Verle Pierce.

B

On September 10, 1979, a Gaston County grand jury indicted Williams for the first-degree murder and armed robbery of Joines. Following a jury trial in June 1980, Williams was convicted of both charges.[2] In the bifurcated proceeding, the State presented evidence of only one aggravating circumstance, that Joines' murder was part of a course of conduct in which Williams engaged and which included the commission by Williams of other crimes of violence against another person or persons, to wit, the robbery and murder of Susan Verle Pierce, see North Carolina General Statutes

_____

[2] Williams' armed robbery conviction was set aside because the indictment identified Massey, instead of Williams, as the perpetrator of the armed robbery. See State v. Williams, 292 S.E.2d 243, 247 n.1 (N.C. 1982).

3

§ 15A-2000(e)(11). The jury found beyond a reasonable doubt that the aggravating circumstance outweighed the mitigating circumstances[3] and recommended that Williams be sentenced to death. The trial court sentenced Williams in accordance with the jury's recommendation.[4]

On direct appeal, the North Carolina Supreme Court affirmed Williams' conviction and sentence. See State v. Williams, 292 S.E.2d 243, 264 (N.C. 1982). On November 29, 1982, the United States Supreme Court denied Williams' petition for a writ of certiorari. See Williams v. North Carolina, 459 U.S. 1056 (1982).

On April 5, 1983, Williams filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Western District of North Carolina, alleging approximately seventeen grounds for relief. Contemporaneously, Williams filed a

---

[3] The trial court submitted ten mitigating circumstances and the jury found the existence of the following seven: (1) Williams had no significant history of prior criminal activities; (2) Williams was twenty-four years old at the time of the murder; (3) Williams had a good employment record; (4) Williams had voluntarily submitted himself for drug treatment; (5) Williams had a good character and reputation; (6) Williams was considerate and loving to his mother and sisters; and (7) Williams was a considerate and loving father. The jury declined to find the following mitigating circumstances: (1) Williams had an I.Q. of sixty-nine; (2) Williams had acted appropriately in connection with a personal injury claim; and (3) there were other circumstances of mitigating value which arose from the evidence.

[4] Prior to his conviction in Gaston County Superior Court, Williams was convicted of first-degree murder in Cabarrus County Superior Court for the murder of Susan Verle Pierce. Williams was sentenced to death, but on appeal, the North Carolina Supreme Court remanded the case for resentencing because the trial court erroneously submitted the aggravating circumstance that the murder "was committed for the purpose of avoiding or preventing a lawful arrest," N.C. Gen. Stat. § 15A-2000(e)(4). See State v. Williams , 284 S.E.2d 437, 455-57 (N.C. 1981). In February 1985, Williams was resentenced, and the jury again recommended that Williams be sentenced to death. On appeal, the North Carolina Supreme Court remanded for a new sentencing hearing because of the prosecutor's improper closing argument. See State v. Williams, 346 S.E.2d 405 (N.C. 1986). To date, Williams has not been resentenced.

4

motion to consolidate one of his claims, challenging the use of "death-qualified" juries,[5] with similar claims being raised by three other non-capital habeas petitioners. On June 9, 1983, United States District Judge James B. McMillan entered an order granting the motion to consolidate. Following further briefing, Williams filed a motion for partial summary judgment on a different claim, that three jurors were excused for cause in violation of Witherspoon v. Illinois, 391 U.S. 510 (1968).

On January 12, 1984, Judge McMillan entered an order holding that the use of "death-qualified" juries violated the Sixth and Fourteenth Amendments, and that one of the prospective jurors at Williams' trial was improperly excused for cause from the petit jury in violation of Witherspoon. See Keeten v. Garrison, 578 F. Supp. 1164 (W.D.N.C. 1984). None of the other claims in Williams' habeas petition was addressed by Judge McMillan. On March 5, 1984, in accordance with his decision, Judge McMillan granted Williams a new trial and sentencing, but stayed his judgment pending appeal by the State.

On August 21, 1984, we reversed the grant of habeas relief, holding that the use of "death qualified" juries did not violate the Sixth and Fourteenth Amendments, and that none of the prospective jurors in Williams' petit jury was excluded in violation of Witherspoon. See Keeten v. Garrison, 742 F.2d 129, 133-35 (4th Cir. 1984). On May 27, 1986, the Supreme Court denied certiorari review in Keeten. See Keeten v. Garrison, 476 U.S. 1145 (1986). Following the denial of Williams' petition for a writ of certiorari in Keeten, Williams' federal habeas petition lingered in the district court for some time.

In August 1990, the Gaston County Superior Court set Williams' execution for November 2, 1990, but Judge McMillan entered a stay on September 7, 1990 pending further order of the court, so as to

_____

[5] A "death qualified jury" is a jury made up of jurors who will consider imposing the death penalty and are permitted to serve in capital cases under Witherspoon v. Illinois, 391 U.S. 510 (1968). See Keeten v. Garrison, 742 F.2d 129, 132 n.4 (4th Cir. 1984). In Witherspoon, the Supreme Court held that a venireman in a capital case may be excluded for cause if he is unwilling "to consider all of the penalties provided by state law." 391 U.S. at 522 n.21.

allow the adjudication of Williams' federal habeas petition. The case continued to linger in the district court and, in June 1993, the case was reassigned to United States District Judge Graham C. Mullen because of Judge McMillan's pending retirement.

In April 1994, Williams was permitted to return to state court to exhaust his state remedies. Williams filed a motion for appropriate relief in state court and, following an evidentiary hearing, that motion was denied on November 17, 1995. On November 7, 1996, the North Carolina Supreme Court denied Williams' petition for a writ of certiorari. See State v. Williams, 478 S.E.2d 12 (N.C. 1996).

When the case returned to federal court, it was assigned to a magistrate judge for the preparation of a report and recommendation. Because this case had withered on the vine for so long, the magistrate judge ordered Williams to file an amended petition. The magistrate judge's order directed Williams to state all claims in the amended petition "in light of all case developments to date, as well as whatever changes may have occurred in the law." On January 16, 1997, Williams filed an amended petition for a writ of habeas corpus. On March 31, 1997, the magistrate judge filed a report and recommendation, recommending that Williams' amended federal habeas corpus petition be denied, and that the stay entered previously by Judge McMillan be dissolved. On May 28, 1997, Judge Mullen adopted the magistrate judge's memorandum and recommendation, and entered an order denying Williams' amended habeas petition. Williams noted a timely appeal.

II

Each of the claims raised by Williams in this appeal, save two, was found in state court to be procedurally defaulted. As to each claim held to be procedurally defaulted, the state court concluded that Williams was in a position to raise the claim on direct appeal, but did not, and, therefore, the claim was procedurally defaulted under North Carolina General Statutes § 15A-1419(a)(3), which provides that a claim is not cognizable on state habeas if the defendant was in a position to raise the claim in a previous appeal. The state court's application of a procedural default rule brings into play the federal rules of procedural default.

6

Under the doctrine of procedural default, absent cause and actual prejudice or a miscarriage of justice,**6** a federal habeas court may not review constitutional claims when a state court has declined to consider their merits on the basis of an adequate and independent state procedural rule. See Harris v. Reed, 489 U.S. 255, 262 (1989).**7** Such a rule is adequate if it is regularly or consistently applied by the state court, see Johnson v. Mississippi, 486 U.S. 578, 587 (1988), and is independent if it does not "depend[ ] on a federal constitutional ruling," Ake v. Oklahoma, 470 U.S. 68, 75 (1985).**8**

Under federal habeas law, we are not at liberty to question a state court's application of a state procedural rule because a state court's finding of procedural default is not reviewable if the finding is based upon an adequate and independent state ground. See Harris, 489 U.S. at 262; Barnes v. Thompson, 58 F.3d 971, 974 n.2 (4th Cir. 1995). The state procedural rule applied in this case, North Carolina General Statutes § 15A-1419(a)(3), is an independent and adequate state ground. See Ashe v. Styles, 39 F.3d 80, 87-88 (4th Cir. 1994) (explaining that a federal habeas petition should have been denied on the basis of procedural default because the state court denied relief pursuant to § 15A-1419(a) which is "an adequate and independent state law ground of decision"); O'Dell v. Netherland , 95 F.3d 1214, 1241 (4th

---

**6** Before this court, Williams has not attempted to establish that our refusal to address his procedurally defaulted claims would result in a "miscarriage of justice." Accordingly, we do not address the "miscarriage of justice" exception in this opinion.

**7** A procedural default also occurs when a habeas petitioner fails to exhaust available state remedies and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." Coleman v. Thompson, 501 U.S. 722, 735 n.1 (1991).

**8** A distinct but related limit on the scope of federal habeas review is the doctrine of exhaustion. In the interest of giving state courts the first opportunity to consider alleged constitutional errors occurring in a state prisoner's trial and sentencing, a state prisoner must exhaust all available state remedies before he can apply for federal habeas relief. See Matthews v. Evatt, 105 F.3d 907, 910-11 (4th Cir.), cert. denied, 118 S. Ct. 102 (1997); see also 28 U.S.C.§ 2254(b). To exhaust state remedies, a state prisoner must fairly present the substance of his claim to the state's highest court. See Matthews, 105 F.3d at 911.

7

Cir. 1996) (en banc) (holding that unambiguous procedural rules derived from state statutes or court rules are necessarily "firmly established" (internal quotation marks omitted)), aff'd, 117 S. Ct. 1969 (1997). Therefore, we can consider only whether cause and prejudice exists to excuse the procedural default, not whether the state court correctly applied its own law. See Harris, 489 U.S. at 262.

Findings of the state court supporting its decision to apply the state procedural default rule are entitled to a presumption of correctness in determining whether cause exists to excuse a procedural default. See 28 U.S.C. § 2254(d); Sumner v. Mata, 449 U.S. 539, 547 (1981); Stockton v. Murray, 41 F.3d 920, 924 (4th Cir. 1994). Objective factors that constitute cause include "'interference by officials' that makes compliance with the State's procedural rule impracticable, and `a showing that the factual or legal basis for a claim was not reasonably available to counsel.'" McClesky v. Zant , 499 U.S. 467, 493-94 (1991) (quoting Murray v. Carrier, 477 U.S. 478, 488 (1986)); see also Smith v. Murray, 477 U.S. 527, 537 (1986) ("[T]he question is not whether subsequent legal developments have made counsel's task easier, but whether at the time of the default the claim was `available' at all."); Clanton v. Muncy, 845 F.2d 1238, 1241 (4th Cir. 1988). Additionally, the novelty of a claim has been held to constitute cause. See Reed v. Ross, 468 U.S. 1, 12-16 (1984); see also Dugger v. Adams, 489 U.S. 401, 407 (1989) (cause may be established upon demonstration that a constitutional claim is "so novel that its legal basis is not reasonably available to counsel"). Finally, a petitioner may establish "cause" by showing he received constitutionally ineffective assistance of counsel. See Coleman, 501 U.S. at 753; Murray, 477 U.S. at 488.**9**

_____

**9** Generally, "a claim of ineffective assistance [must] be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default." Murray , 477 U.S. at 489; see also Pruett v. Thompson, 996 F.2d 1560, 1570 (4th Cir. 1993). This is so because allowing a petitioner to raise a claim of ineffective assistance of counsel for the first time on federal habeas review in order to show cause for a procedural default would place the federal habeas court "in the anomalous position of adjudicating an unexhausted constitutional claim for which state court review might still be available" in contravention of "[t]he principle of comity that underlies the exhaustion doctrine." Murray, 477 U.S. at 489. Williams has satisfied this requirement by presenting all of his ineffective assistance of appellate counsel claims to the state court on state habeas.

8

If attorney error amounts to constitutionally ineffective assistance of counsel under the standard established in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), the Sixth Amendment dictates that the attorney's error must be imputed to the state. <u>See Coleman</u>, 501 U.S. at 754. Williams is constitutionally entitled to the effective assistance of counsel on direct appeal. <u>See Evitts v. Lucey</u>, 469 U.S. 387, 396 (1985). Accordingly, he may establish cause to excuse his procedural default by showing appellate attorney error that satisfies the standard set forth in <u>Strickland</u>. <u>See Coleman</u>, 501 U.S. at 752. Under <u>Strickland</u>, a defendant is deprived of the assistance of counsel guaranteed by the Constitution when counsel's performance falls "below an objective standard of reasonableness" and "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 688, 694.

To establish "actual prejudice," the petitioner "must shoulder the burden of showing, not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." <u>United States v. Frady</u>, 456 U.S. 152, 170 (1982); <u>Satcher v. Pruett</u>, 126 F.3d 561, 572 (4th Cir.), <u>cert. denied</u>, 118 S. Ct. 595 (1997).**10**

With these principles in mind, we address each of the claims raised by Williams in this appeal.

_____

**10** It is not clear whether the showing of prejudice required to excuse a procedural default is identical to the showing of prejudice required to establish ineffective assistance of counsel, namely, that "there is a reasonable probability that, but for [the errors], the result of the proceeding would have been different," <u>Strickland</u>, 466 U.S. at 694. <u>See Freeman v. Lane</u>, 962 F.2d 1252, 1258-59 & n.5 (7th Cir. 1992) (discussing distinction between procedural bar and ineffective assistance "prejudice" tests); <u>see also United States v. Dale</u>, 1998 WL 168707, *1 n.3 (D.C. Cir. 1998); <u>United States v. Walling</u>, 982 F.2d 447, 449 (10th Cir. 1992). However, we need not decide this issue because Williams has satisfied neither standard in this case.

9

A

Williams initially contends that an actual conflict of interest infected the Public Defender's Office's representation of him during the trial of his case. According to Williams, an actual conflict of interest was created by the Public Defender's Office's brief representation of Massey while simultaneously representing him, and that this actual conflict of interest adversely affected his trial counsels' performance.

Williams presented this claim in his state habeas petition and it was found to be procedurally defaulted under North Carolina General Statutes § 15A-1419(a)(3) because the claim was not raised on direct appeal. Because North Carolina General Statutes§ 15A-1419(a)(3) is an independent and adequate state ground, see Ashe, 39 F.3d at 87-88; O'Dell, 95 F.3d at 1241, we can consider this claim only if Williams establishes cause and prejudice.

Williams contends that the factual or legal basis for this claim was not available to him on direct appeal. We disagree, and our analysis begins with a summary of the facts underlying Williams' claim.

At Williams' initial appearance in Gaston County District Court on June 12, 1979, the Public Defender's Office was appointed to represent Williams, and Assistant Public Defender R.C. Cloninger, Jr., and Jesse B. Caldwell, III, continued to represent Williams until the conclusion of the trial. Following the Public Defender's Office's appointment, David Wells, an investigator with the Public Defender's Office, met with Williams in the Gaston County Jail sometime between 2:00 and 3:00 p.m. that afternoon. At approximately 4:10 p.m. that same day, Wells returned to the Public Defender's Office and informed Public Defender Curtis Harris about that office's appointment to represent Williams. Because of concern about Massey making incriminating statements to the police, and expecting to be appointed to represent Massey, Harris and Wells proceeded to the Gastonia Police Department to meet with Massey.

When they arrived, Massey was being interviewed by the police. Between 4:30 and 4:45 p.m., Harris and Wells met briefly with Massey to determine if she was indigent. According to Harris, Massey was hysterical and unable to communicate verbally, although Massey

10

was able to inform Harris and Wells that she had been told that she was going to be the first woman to be executed in the gas chamber. Harris and Wells met with Massey again that evening at approximately 8:30 p.m., but Massey was again unable to communicate.

The following morning between 10:00 a.m. and noon, Harris and Wells met with Massey a third time. According to Harris and Wells, Massey was in the same emotional state, but was able to communicate by writing on a legal pad. In one such writing, Massey wrote: (1) that she had talked to a man named Larry Currus one day; (2) that Currus had lots of guns, and talked about killing all the time; (3) that if Currus thought Massey had told the police about him, he would kill her; (4) that she told Currus that the police were looking for Williams, and Currus said that his name must not be mentioned or Massey's family would be in trouble; (5) that Massey did not say anything to the police about Currus because of her two children being at home; and (6) that Williams was a "little mean," but Currus was "very mean."

At 2:00 p.m. that afternoon, Massey was charged as an accessory after the fact to the murder of Joines. Massey was found indigent, and the Public Defender's Office was appointed to represent Massey. The following morning, Harris made an oral motion in Gaston County District Court to withdraw from his appointment to represent Massey on the basis of, among other things, statements given by Massey incriminating Williams. The District Court granted the motion. The Gaston County District Court appointed James R. Funderburk to represent Massey, and Funderburk was replaced by Joe Roberts in December 1979.

The conflict of interest issue was not developed at trial by Cloninger or Caldwell. Following Williams' trial, Appellate Public Defenders Adam Stein and Ann Petersen were appointed to represent Williams. On direct appeal, appellate counsel raised eighty-nine assignments of error, but did not assert a conflict of interest claim. At the state habeas hearing, Stein testified that, at the time Williams' brief on direct appeal was prepared, he was aware of general conflict of interest law. However, Stein had no recollection of making a decision on whether to raise a conflict of interest claim. Stein also testified, in reference to Harris' testimony at the sentencing phase of

11

Williams' trial, that Harris' testimony should have alerted him to a potential conflict of interest. Also of note, in Williams' brief on direct appeal, counsel preserved an issue, even though it was not being raised on direct appeal, by noting the issue and explaining that counsel felt additional evidence needed to be developed. The issue concerned the trial court's denial of Williams' motion for new trial.

We are of the opinion that Williams has not established cause to excuse the procedural default of his conflict of interest claim because the record reflects Williams could have raised this claim on direct appeal. First, there was no state law barrier preventing Williams from raising a conflict of interest claim on direct appeal. Indeed, the North Carolina Supreme Court has addressed conflict of interest claims on direct appeal. See, e.g., State v. Bruton, 474 S.E.2d 336, 343 (N.C. 1996) (no ineffective assistance of counsel when both defendants were represented by same lawyer at trial). Second, the essential facts underlying the claim were known or should have been known by Williams' appellate counsel. Williams' appellate counsel were well aware that the Public Defender's Office briefly represented Williams and Massey and were aware of the substance and approximate timing of Massey's statements to Harris and Wells. Williams' appellate counsel were also aware of the strategic reasons cited by Williams' trial counsel in support of the decision not to introduce Massey's statements. For these reasons, Williams has not met his burden of "`showing that the factual or legal basis for [the conflict of interest] claim was not reasonably available to counsel.'" McClesky , 499 U.S. at 494 (quoting Murray, 477 U.S. at 488).**11**

_____

**11** In support of his argument, Williams relies on an affidavit from Stein dated June 11, 1997, which was proffered for the first time in the district court after the district court ruled against Williams. In his affidavit, Stein states that he did not believe that he or Petersen was in possession of sufficient facts to raise the conflict of interest issue on direct appeal. Stein's affidavit contradicts his earlier testimony at the state habeas hearing that he had no recollection of a conflict of interest issue. Additionally, it is apparent from the state court record that appellate counsel for Williams simply failed to recognize the conflict of interest issue. Specifically, as evidenced by counsels' reservation of the issue concerning Williams' motion for new trial, if Williams' appellate counsel recognized the conflict of interest issue, the issue would have been raised and reserved. In

12

Even if we were to agree with Williams that cause exists to excuse his procedural default, Williams cannot establish prejudice. The Sixth Amendment guarantees criminal defendants the right to effective assistance of counsel, including the right to representation free of conflicts. See Strickland, 466 U.S. at 688; United States v. Swartz, 975 F.2d 1042, 1047 (4th Cir. 1992). To prevail on a conflict of interest claim, a petitioner must establish the existence of an actual conflict of interest, see Cuyler v. Sullivan, 446 U.S. 335, 348 (1980). To establish an actual conflict of interest, the petitioner must show that his interests "diverge[d] with respect to a material factual or legal issue or to a course of action." Id. at 356 n.3 (Marshall, J., concurring in part and dissenting in part). Additionally, the petitioner must establish that the actual conflict adversely affected his counsel's performance. See id. at 348; Swartz, 975 F.2d at 1048. The adverse performance prong is met if the attorney took action on behalf of one client that was necessarily adverse to the defense of the other or failed to take action on behalf of one because it would adversely affect the other. See United States v. Tatum, 943 F.2d 370, 376 (4th Cir. 1991). If the petitioner makes these showings, prejudice is presumed and he is entitled to habeas relief. See Cuyler, 446 U.S. at 349-50. The question of whether counsel labored under an actual conflict of interest that affected counsel's performance is a mixed question of law and fact that we review de novo. See id. at 342.

Even if we assume the existence of an actual conflict, Williams has not established that any conflict adversely affected his counsels' performance. Williams argues that the Public Defender's Office's representation of him was adversely affected by Harris' brief

_____

any event, Stein's June 1997 affidavit cannot be considered on federal collateral review absent a showing of cause and prejudice, or a fundamental miscarriage of justice. See Keeney v. Tamayo-Reyes, 504 U.S. 1, 8-12 (1992) (holding that when a state has given a petitioner a full and fair hearing on a claim and he has failed to develop material facts to support it, he is not entitled to develop further facts in a federal habeas evidentiary hearing unless he demonstrates either cause for the failure and prejudice resulting therefrom or a fundamental miscarriage of justice). Williams points to nothing that would suggest this evidence could not have been developed in state court.

13

representation of Massey because, during his brief representation of Massey, Harris negotiated a plea agreement on behalf of Massey with the State. However, there is no evidence that Harris or anyone else at the Public Defender's Office negotiated a plea agreement on behalf of Massey in the brief time that the Public Defender's Office was involved in her case. Neither Harris nor anyone from his office testified that such a plea bargain arrangement had been discussed with the prosecution, and, given the timing of such a small window of opportunity, it is highly unlikely that such a discussion could have taken place. While Massey's attorney, James Funderburk, may have assumed that Massey would testify for the State pursuant to a plea agreement, it does not follow that the Public Defender's Office already had made such an arrangement with the prosecution. In short, Williams' claim on this score is too speculative to infer that Williams' counsels' performance was adversely affected by Harris' brief representation of Massey.

Williams also claims that the Public Defender's Office's representation of him was adversely affected by Harris' brief representation of Massey because Williams' trial counsel, due to the conflict, were unable to effectively cross-examine Massey about her statements concerning Larry Currus. However, the statements concerning Currus did not impeach Massey, and it was reasonable for Williams' trial counsel to refrain from questioning Massey about such statements. Massey's statements to Harris and Wells did not implicate Currus. The statements only alluded to his being armed, dangerous, and threatening. Therefore, Massey's statements concerning Currus did not conflict with her statements that Williams was the perpetrator. Under such circumstances, Williams' counsels' performance was not adversely affected by the decision to forego questioning Massey about her statements concerning Currus.

Finally, Williams argues that his trial counsels' performance was adversely affected by Harris' brief representation of Massey because Harris was called as a witness during the sentencing phase of his trial. Harris was called to testify as to Massey's physical and emotional condition on the afternoon of June 12, 1979, in an attempt to show that Massey's statements may have been coerced. Harris testified that Massey was "hysterical" and "emotionally upset." According to Williams, he was prejudiced because the attorney-client privilege pre-

14

vented Harris from testifying about Massey's reference to Currus. However, as noted above, Massey's statements regarding Currus were of no help to Williams. In any event, the same information Williams sought through Harris was available through Massey. Accordingly, Harris' testimony at the sentencing phase of Williams' trial had no adverse affect on Williams' trial counsels' performance.

In summary, we have thoroughly reviewed the record in this case and are confident that Williams' trial counsels' performance was not adversely affected by Harris' brief representation of Massey. Accordingly, Williams has not established that he was prejudiced by the procedural default of his conflict of interest claim. **12**

B

Next, Williams, who is black, argues that the foreman of the grand jury that indicted him was selected in a racially discriminatory manner in violation of the Equal Protection Clause of the Fourteenth Amendment. Williams' argument is premised on his allegations that: (1) Gaston County had a black population of 12.1% in 1970 and 12.2% in 1980; (2) in the years preceding his indictment, a "substantial number" of blacks had served on Gaston County grand juries; and (3) prior to the date of his indictment, no black had ever served as grand jury foreman in Gaston County.

_____

**12** Williams also argues that his appellate counsel were constitutionally ineffective for failing to raise the conflict of interest issue on direct appeal. This claim was rejected on the merits by the state habeas court. The claim was raised on appeal from the denial of state habeas relief, but the North Carolina Supreme Court denied certiorari review. Accordingly, the claim is preserved for our review. Under Strickland, a defendant is deprived of the assistance of counsel guaranteed by the Constitution when counsel's performance falls "below an objective standard of reasonableness" and "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 688, 694. For the same reasons why Williams cannot establish prejudice to excuse the procedural default of his conflict of interest claim, he cannot establish that he was prejudiced by his appellate counsels' failure to raise the claim on direct appeal. In all events, the result of Williams' trial and appeal would have been the same.

15

Williams raised this claim for the first time on state habeas.**13** The state habeas court dismissed the claim pursuant to North Carolina General Statutes § 15A-1419(a)(3) because the claim could have been raised on direct appeal, but was not. The claim was raised on appeal to the North Carolina Supreme Court from the denial of state habeas relief, but that court denied certiorari review. Because North Carolina General Statutes § 15A-1419(a)(3) is an independent and adequate state ground, see Ashe, 39 F.3d at 87-88; O'Dell, 95 F.3d at 1241, Williams must establish cause and prejudice to excuse the procedural default.

Williams argues that he has established cause to excuse the procedural default. According to Williams, this claim was novel at the time of his direct appeal and, therefore, "unavailable." This argument has no merit.

In fact, far from being novel, the legal framework for developing the claim Williams seeks to press here was in place three years before Williams' direct appeal in 1982. In July 1979, the Supreme Court in Rose v. Mitchell, 443 U.S. 545 (1979), had before it a case in which the petitioners alleged that discrimination in the selection of a Tennessee grand jury foreman violated their rights under the Equal Protec-

_____

**13** On direct appeal, Williams alleged that the trial court erred in refusing to dismiss his indictment on the ground that the grand jury and petit jury venires were selected in a racially discriminatory manner. The North Carolina Supreme Court held that the trial court properly denied Williams' request to dismiss the indictment, because the parties stipulated that there was no evidence of any intentional discrimination in the preparation of the master jury panel lists for Gaston County from which the grand jury members and petit jury members were drawn and "counsel did not investigate other sources from which information as to the racial computation of the master jury panel might be determined." Williams, 292 S.E.2d at 252. On direct appeal, Williams also challenged the trial court's refusal to order the State to provide funds so that Williams could hire a statistician to assist him in developing his challenges to the grand jury and petit jury venires. The North Carolina Supreme Court rejected this argument on the basis that Williams failed to demonstrate that there was a reasonable likelihood that the appointment of a statistician would have materially assisted him in the preparation or presentation of his contentions. Id. at 252-53.

16

tion Clause. The Supreme Court "assume[d] without deciding that discrimination with regard to the selection of only the foreman requires that a subsequent conviction be set aside, just as if the discrimination . . . had tainted the selection of the entire grand jury venire," id. at 551-52 n.4, but held that the petitioners failed to make out a prima facie case of discrimination, see id. at 573-74. We recognize that the Court in Rose did not decide the issue pressed here, but merely assumed without deciding that a conviction could be vacated on the basis of race discrimination in the selection of the grand jury foreman. Nevertheless, the underlying theory that racial discrimination in the selection of the grand jury foreman could violate the Equal Protection Clause was the heart of the petitioners' case in Rose. If the petitioners in Rose were in a position to assert the claim before the Supreme Court a year before Williams' trial and three years before his direct appeal, then obviously Williams was in a position to raise the claim at trial or on direct appeal. Because Williams had the benefit of the Supreme Court's decision in Rose, he possessed the legal "tools to construct [this] constitutional claim." Engle v. Issac, 456 U.S. 107, 133 (1982). Therefore, he has failed to establish cause to excuse the procedural default.**14**

C

Williams also argues that he was sentenced to death for the murder of Joines in the absence of a finding that he actually killed Joines, intended to kill Joines, or was a major participant in Joines' murder in violation of Enmund v. Florida, 458 U.S. 782 (1982). The State concedes this issue was exhausted in state court because the substance of the claim was raised on direct appeal to the North Carolina

_____

**14** Even if we were able to proceed beyond the threshold question of procedural default, the nonretroactivity doctrine of Teague would bar our consideration of the merits. In Nickerson v. Lee , 971 F.2d 1125 (4th Cir. 1992), we held "that a rule barring discrimination in the selection of North Carolina grand jury foremen as violative of the Equal Protection Clause would be a new rule of law" under Teague and, therefore, not cognizable on federal habeas review. Id. at 1134. Because, for purposes of Teague, Nickerson's conviction became final after Williams' conviction, the rule of law espoused by Williams is necessarily "new" under Teague.

Supreme Court. See Matthews v. Evatt, 105 F.3d 907, 911 (4th Cir.), cert. denied, 118 S. Ct. 102 (1997) (noting that a claim is exhausted if substance of the claim is presented to the state's highest court). Furthermore, the State does not argue that the principles of nonretroactivity announced in Teague v. Lane, 489 U.S. 288 (1989), bar our consideration of Williams' Enmund claim because Enmund was decided on July 2, 1982, before Williams' conviction became final for Teague purposes on November 29, 1982. Accordingly, we may proceed to the merits of Williams' Enmund claim.

Enmund was a felony-murder case in which the Court held that a death sentence violates the Eighth Amendment when the defendant lacked the intent to kill or cause death. See Enmund, 458 U.S. at 798-801; Fairchild v. Norris, 21 F.3d 799, 802 (8th Cir. 1994). The intent requirement is satisfied when the defendant is a major participant in either the killing or underlying felony, and is recklessly indifferent to human life. See Tison v. Arizona, 481 U.S. 137, 158 (1987); Fairchild, 21 F.3d at 802-03. Thus, the defendant need not have had the specific intent to kill the victim. See Tison, 481 U.S. at 157; Fairchild, 21 F.3d at 802.

The evidence in this case satisfied the Enmund  standard because Williams was a major participant in the murder itself, and his actions showed a reckless indifference to Joines' life. Williams got out of the car carrying his loaded shotgun, went inside the Service Distributors station, stood behind or over Joines, and shot Joines in the back of his head after the robbery had been accomplished. Manifestly, these circumstances satisfy the standard set forth in Enmund and its progeny.

D

Next, Williams argues that the jury was improperly instructed as to its consideration of mitigating circumstances in violation of McKoy v. North Carolina, 494 U.S. 433 (1990). Williams acknowledges this claim is procedurally defaulted under North Carolina General Statutes § 15A-1419(a)(3) because, as the state court held, the claim could have been raised on direct appeal.

Williams argues that even if this claim is procedurally defaulted, we nevertheless may consider it on the merits because he has shown

18

cause and prejudice to excuse the procedural default. Specifically, he maintains that his appellate counsel were constitutionally ineffective for failing to pursue on direct appeal the McKoy claim he now wishes to press. As noted earlier, if appellate counsel were constitutionally ineffective under the standard established in Strickland, cause is established to excuse the procedural default. See Coleman, 501 U.S. at 753. Under Strickland, a defendant is deprived of the assistance of counsel guaranteed by the Constitution when counsel's performance falls "below an objective standard of reasonableness" and "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 688, 694.

In McKoy, the Supreme Court struck down the North Carolina practice that required a capital sentencing jury to find mitigating circumstances unanimously before they could be considered for the purpose of sentencing. McKoy, 494 U.S. at 439-44. The Court held that the unanimity requirement limited the individual juror's consideration of mitigating circumstances and was therefore unconstitutional. Id. Williams claims that if the jury had been properly instructed, the result of the sentencing phase of his trial would have been different. This argument, as Williams apparently concedes, is premised on the proposition that the instructions ran afoul of McKoy. In determining whether the jury instructions violated McKoy, the question is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." Boyde v. California, 494 U.S. 370, 380 (1990).

In this case, the trial court did not give the explicit unanimity instruction on mitigating circumstances that was struck down by the Court in McKoy. The jury was instructed to answer four issues in reaching its decision at the sentencing phase of the trial: (1) whether the jury unanimously found, beyond a reasonable doubt, the existence of the aggravating circumstance; (2) whether the jury unanimously found, beyond a reasonable doubt, that the aggravating circumstance was sufficiently substantial to call for imposition of the death penalty; (3) whether the jury found one or more mitigating circumstances; and (4) whether the jury unanimously found, beyond a reasonable doubt, that the aggravating circumstances outweighed the mitigating circum-

19

stances. We have upheld this portion of the instructions as not violative of <u>McKoy</u> on several occasions. <u>See Noland v. French</u>, 134 F.3d 208, 213-14 (4th Cir. 1998); <u>Smith v. Dixon</u>, 14 F.3d 956, 981 n.15 (4th Cir. 1994) (<u>en banc</u>); <u>Lawson v. Dixon</u>, 3 F.3d 743, 754 (4th Cir. 1993); <u>Maynard v. Dixon</u>, 943 F.2d 407, 418-20 (4th Cir. 1991).

The trial court also instructed the jury that it had to be unanimous as to its sentencing recommendation. Just before releasing the jury to deliberate at the sentencing phase of the trial, the trial court instructed the jury: "When you have agreed upon--unanimously agreed upon your recommendation according to the instructions I have given you, have your foreman write in your recommendation at the bottom part of the second page of this form." On the heels of this instruction, the trial court instructed: "When you agree upon your recommendation unanimously and are ready to deliver it, have it filled in and signed as I instructed you, notify the bailiff, and you will be returned into the courtroom." Williams argues these instructions distinguish this case from <u>Noland</u>, <u>Smith</u>, <u>Lawson</u>, and <u>Maynard</u>. According to Williams, this instruction created a reasonable likelihood that the jury understood the sentencing instructions as requiring unanimity for the finding of mitigating circumstances. We disagree.

While the trial judge did mention that the jury must be unanimous as to its recommendation, the trial court did not state explicitly or imply that unanimity was required as to the existence of mitigating circumstances. The isolated reference--which came after the trial court explained in detail the issues the jury needed to resolve and in the form of a supplemental instruction just before the jurors retired to deliberate--merely underscored the unanimity requirement as to the jury's ultimate sentencing recommendation and the requisite issues the State had to prove unanimously in order for the jury to return a death sentence. No reasonable juror would have understood from these remarks that there was a unanimity requirement for the finding of mitigating circumstances, particularly when the earlier, more comprehensive instructions had not referred to such a requirement. <u>See</u> <u>Noland</u>, 134 F.3d at 213-14 (upholding similar instruction under <u>McKoy</u> even though the jury was instructed, just prior to deliberations, that "[a]fter you have reached a unanimous decision as to each issue . . . have your Foreman mark the appropriate place or places on the issues and recommendations forms"); <u>see also Arnold v. Evatt</u>,

20

113 F.3d 1352, 1363 (4th Cir. 1997) (even though court instructed jury that its sentencing verdict must be unanimous and that it must unanimously find the existence of any aggravating circumstances, there was no substantial probability that the jury could have thought it must agree unanimously as to the existence of any mitigating circumstances), cert. denied, 118 S. Ct. 715 (1998). In the absence of a McKoy violation, Williams cannot demonstrate that his appellate counsel were constitutionally ineffective and, therefore, he cannot establish cause to excuse the procedural default. **15**

E

Williams also argues that evidence presented at his trial and sentencing necessitated the submission to the jury of two statutory miti-

_____

**15** Williams also challenges another instruction given at the sentencing phase of his trial. He contends that the trial court's instruction directing the jury to reject non-statutory mitigating circumstances if the evidence supporting the non-statutory mitigating circumstance lacked mitigating value prevented the jury from considering constitutionally relevant mitigating evidence in violation of his Eighth and Fourteenth Amendment rights. Williams concedes that this claim is procedurally defaulted because it could have been raised on direct appeal, see N.C. Gen. Stat. § 15A-1419(a)(3). Even if Williams could establish cause to excuse the procedural default, he cannot establish that he was prejudiced by the instruction. There is simply no constitutional requirement that a sentencing jury must give effect or value to any evidence offered in mitigation. See Johnson v. Texas, 509 U.S. 350, 368 (1993). Rather, a state is only prohibited from "placing relevant mitigating evidence `beyond the effective reach of the sentencer.'" Id. at 362 (quoting Graham v. Collins, 506 U.S. 461, 475 (1993)). Thus, although a state may not eliminate the presentation of relevant mitigating evidence or preclude the jury from considering certain types of mitigating evidence, a state is free to guide the jury in its consideration of relevant mitigating evidence. See id.; see also Boyde, 494 U.S. at 370 ("[T]here is no . . . constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration of mitigating evidence in an effort to achieve a more rational and equitable administration of the death penalty.") (citation and internal quotes omitted). Because the trial court's instructions on the procedure for finding non-statutory mitigating circumstances did not place relevant mitigating evidence beyond the reach of the jury, Williams' claim of prejudice fails.

21

gating circumstances, North Carolina General Statutes § 15A-2000(f)(2) (crime committed under the influence of mental disturbance) and North Carolina General Statutes § 15A-2000(f)(6) (defendant lacked the capacity to appreciate the criminality of his actions). This contention is meritless.

The state habeas court held that Williams was in a position to adequately raise this claim on direct appeal, but did not do so, and, therefore, the claim was procedurally defaulted under North Carolina General Statutes § 15A-1419(a)(3). Williams raised this claim before the North Carolina Supreme Court on appeal from the denial of state habeas relief, but that court denied certiorari review. Because North Carolina General Statutes § 15A-1419(a)(3) is an independent and adequate state ground, see Ashe, 39 F.3d at 87-88; O'Dell, 95 F.3d at 1241, we can consider only whether cause and prejudice exists to excuse the procedural default.

Williams urges us to excuse the procedural default on the basis that his trial counsels' failure to request the submission of these two statutory mitigating circumstances rendered his trial counsel ineffective. This argument founders because the decision not to submit these two statutory mitigating circumstances was a quintessential tactical one. Williams' counsel reviewed the psychiatric reports and concluded that the evidence in the reports did not support the submission of either the (f)(2) or the (f)(6) mitigating circumstances. Rather than introduce the reports into evidence and risk the admission of damaging information about the Pierce murder, counsel for Williams and the State stipulated to Williams' I.Q. of 69, and then requested the submission of the I.Q. of 69 as a non-statutory mitigating circumstance. Neither of Williams' counsel felt that an I.Q. of 69 supported, by itself, the submission of the (f)(2) or (f)(6) statutory mitigating circumstances. Therefore, the failure of Williams' counsel to seek the submission of either the (f)(2) or the (f)(6) mitigating circumstance was tactical, and cannot be second-guessed by this court. See Smith, 477 U.S. at 534 ("[A] deliberate, tactical decision not to pursue a particular claim is the very antithesis of the kind of circumstance that would warrant excusing a defendant's failure to adhere to a State's legitimate rules for the fair and orderly disposition of criminal cases."); Murray, 477 U.S. at 485 (default "pursuant to a trial strategy or tactical decision" of counsel does not constitute cause).

22

F

Next, Williams argues that his trial counsel were ineffective for failing to investigate certain witness statements. On June 4, 1980, during Williams' trial, Joel Groves, an investigator in the Public Defender's Office, interviewed four Gaston County Jail inmates: John Poag, Bernard Taylor, Marvin Ledbetter, and Michael Johnson. Poag told Groves that Brawley told him that he (Brawley) had lied about Williams at Williams' Cabarrus County trial and that, contrary to Brawley's testimony at both trials, Brawley had not witnessed Williams rob or shoot anyone. Johnson, Ledbetter, and Taylor corroborated all or part of Poag's account of his conversation with Brawley. Williams contends that trial counsels' failure to introduce the testimony of Poag, Taylor, Ledbetter, and Johnson rendered his trial counsels' performance ineffective.

The state habeas court held that Williams was in a position to adequately raise this claim on direct appeal, but did not do so, and, therefore, the claim was procedurally defaulted under North Carolina General Statutes § 15A-1419(a)(3). On appeal from the denial of state habeas relief, Williams raised this claim, but the North Carolina Supreme Court denied certiorari review. Because North Carolina General Statutes § 15A-1419(a)(3) is an independent and adequate state ground, see Ashe, 39 F.3d at 87-88; O'Dell, 95 F.3d at 1241, Williams must establish cause and prejudice to excuse the procedural default.

Even if Williams could establish cause to excuse the procedural default of this claim, he cannot establish prejudice. To establish prejudice, Williams must show "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." Frady, 456 U.S. at 170. Williams has not met this burden. The record reflects that Williams' counsel extensively cross-examined Brawley during the guilt phase of the trial regarding inconsistent statements Brawley made at the Gaston County Jail and to the police. Therefore, any impeachment value derived from the four witnesses would have been cumulative at best.

23

G

Williams' remaining arguments require little discussion. First, Williams challenges the trial court's felony murder instruction and "course of conduct" aggravating circumstance instruction. He contends these instructions violated his Sixth, Eighth, and Fourteenth Amendments rights. Second, Williams argues that the trial court excused three prospective jurors during a private, unrecorded bench conference in violation of his right to be present during all critical stages of trial guaranteed by the Sixth and Fourteenth Amendments. These arguments are meritless.

Williams presented these claims on state habeas, and the state court found that they were procedurally defaulted under North Carolina General Statutes § 15A-1419(a)(3) because Williams failed to raise these claims on direct appeal. Williams raised these claims before the North Carolina Supreme Court on appeal from the denial of state habeas relief, but that court denied certiorari review. Because North Carolina General Statutes § 15A-1419(a)(3) is an independent and adequate state ground, see Ashe, 39 F.3d at 87-88; O'Dell, 95 F.3d at 1241, we can consider only whether cause and prejudice exists to excuse the procedural default. Williams points to nothing that would suggest the first time he could have raised these claims was on state habeas. Accordingly, he has failed to establish cause for the procedural default of these claims.[16]

III

For the reasons stated herein, the judgment of the district court should be affirmed.

AFFIRMED

_____

[16] Williams also contends that the district court abused its discretion in failing to address claims that were raised in his original habeas petition but were not restated in his amended petition. We have reviewed this assignment of error and find it to be without merit. Furthermore, we have examined these claims and conclude that they provide no basis for habeas relief.