Rehearing en banc granted by order filed
10/23/00; published opinion issued 9/14/00
is vacated

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

WALTER MICKENS, JR.,
Petitioner-Appellant,

v.

JOHN B. TAYLOR, Warden, Sussex I
State Prison,
Respondent-Appellee.

No. 00-4

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Robert E. Payne, District Judge.
(CA-98-102-3)

Argued: June 6, 2000

Decided: September 14, 2000

Before WIDENER, MICHAEL, and MOTZ, Circuit Judges.

_____

Reversed by published opinion. Judge Michael wrote the majority
opinion, in which Judge Motz joined. Judge Widener wrote a dissent-
ing opinion.

_____

**COUNSEL**

**ARGUED:** Robert James Wagner, WAGNER & WAGNER, Rich-
mond, Virginia, for Appellant. Robert Quentin Harris, Assistant
Attorney General, OFFICE OF THE ATTORNEY GENERAL, Rich-
mond, Virginia, for Appellee. **ON BRIEF:** Robert E. Lee, Jr., VIR-
GINIA CAPITAL REPRESENTATION RESOURCE CENTER,

Richmond, Virginia, for Appellant. Mark L. Earley, Attorney General of Virginia, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellee.

_____

**OPINION**

MICHAEL, Circuit Judge:

In 1993 a jury in Virginia state court convicted Walter Mickens of capital murder, and he was sentenced to death. Mickens' federal habeas counsel discovered something by chance that Mickens did not know: Mickens' lead counsel in his murder case was representing the murder victim on criminal charges at the time of the victim's death. The state judge who appointed counsel for Mickens knew or should have known that the back-to-back representation presented an apparent conflict, but the judge failed to inquire. This looks bad, but there is more. Mickens' lead counsel had an actual conflict of interest as a result of his representation of the murder victim. These circumstances, taken together, require that Mickens be afforded a new trial under the authority of Wood v. Georgia, 450 U.S. 261 (1981). We therefore reverse the district court's judgment denying Mickens a writ of habeas corpus. The district court will award the writ on remand unless the Commonwealth of Virginia gives Mickens a new trial.

I.

We take the facts about the crime from the Supreme Court of Virginia, Mickens v. Commonwealth, 442 S.E.2d 678 (Va. 1994). See 28 U.S.C. § 2254(e)(1). On March 28, 1992, Timothy Hall, age seventeen, was living with his fourteen-year-old friend, Raheem Gordon, and Gordon's father in an apartment at 28th and Washington Streets in Newport News, Virginia. Between 7:00 and 8:00 p.m. that evening, Hall gave young Gordon a ride to the nearby Towers apartment building, where Gordon attended a party. Hall had intended to go to the same party later, but he never appeared. One item about Hall's dress that evening becomes important later: he was wearing a pair of Gordon's Nike brand "Cross Trainer" athletic shoes. At about 8:00 p.m. Vincent West and Bruce Mitchell, who were attending the Towers

2

party, left and went to a nearby convenience store. After buying a few items and leaving the store, West and Mitchell went to a park next to the Towers building. While sitting in the park, West and Mitchell saw a man with a bicycle hiding in some bushes and looking at them. The man was later identified as the petitioner, Walter Mickens. Less than forty hours later, at about 12:30 p.m. on March 30, 1992, Chris Basford was walking along the James River in Newport News when he saw a body lying face down on a mattress beneath an abandoned construction company building. The body's legs were spread apart, and it was nude from the waist down, except for socks. The body was identified as that of Timothy Hall. Pubic hairs were recovered from the buttocks of Hall's body. There were bloody "transfer" stains on the outsides of his thighs, and there was a white liquid substance close to his anus. The autopsy by the medical examiner revealed that Hall had been subjected to 143 separate "sharp force injuries." The examiner concluded that Hall had bled to death and that twenty-five of the wounds were fatal. The examiner opined that the fatal wounds may not have caused instant death and that Hall could have lived as long as thirty to forty minutes after infliction of the last wound.

On the evening of April 4, 1992 (five days after Hall's body was found), the Newport News police, Officer D. A. Seals and Detective Dallas Mitchell, responded to a complaint that an African-American male, who was riding a bicycle, had assaulted a juvenile. Seals and Mitchell soon found Mickens riding a bicycle in the parking area at the abandoned construction company building. When Seals displayed his badge and approached Mickens, Mickens fled on his bicycle. He did not get far. Seals and Mitchell tracked Mickens down as he was being detained by other officers. Mickens was arrested at 7:00 p.m. on the charges involving the juvenile. After Mickens was given his Miranda warnings, he agreed to talk. Without telling Mickens how Hall had been murdered, Detective Mitchell told Mickens that he knew Mickens had killed Hall. Mickens denied any involvement in Hall's murder, but said, "You didn't find any knife on me, did you?" The following morning, the police obtained warrants charging Mickens with the murder and attempted sodomy of Hall. When Detective Seals handed Mickens the warrants, Mickens said, "I accept the warrants, I accept the charges." Seals asked Mickens what he meant by that, and Mickens responded, "Mother f___r, if I told you I accept the warrants that means I'm guilty, don't it?"

3

On April 7, 1992, the police found Michael Jacobs wearing the Nike brand "Cross Trainer" shoes that Hall had been wearing when Raheem Gordon had last seen Hall alive. Jacobs testified that he had bought the shoes from Mickens for $5.00 the previous week (the week Hall's body was found).

The Commonwealth offered the following evidence through expert witnesses. The pubic hairs removed from Hall's buttocks were from an African-American and were alike in "all identifiable microscopic characteristics" to the pubic hair sample taken from Mickens, who is African-American. Tissue was attached at the roots of the hairs, indicating that the hairs had been forcibly removed, possibly by the rubbing of genitals against Hall's buttocks. The stain on the mattress cover was of human sperm. DNA analysis (RFLP type) revealed that Hall could not have produced the sperm. Mickens' DNA pattern matched the DNA pattern in the sperm, however. The approximate percentages of the population that could have deposited the sperm were one in 27,000 Caucasians, one in 6,000 African-Americans, and one in 2,000 Hispanics.

On March 26, 1993, about a year after Hall's murder, Mickens was in a holding cell at the courthouse with a man named Tyrone Brister. Brister testified about his encounter with Mickens. Brister asked Mickens why he was there, and Mickens answered,"They said I stabbed somebody 140 something times in the head." Mickens then lowered his voice and said, "which I did." Mickens also told Brister that "they" said he also sodomized the victim and stole his sneakers. Again, Mickens lowered his voice and said, "which I did."

The jury found Mickens guilty of the capital murder of Hall, specifically, murder during the commission of, or following, an attempted forcible sodomy. Mickens was sentenced to death, and the Supreme Court of Virginia affirmed. See Mickens v. Commonwealth, 442 S.E.2d 678 (Va. 1994). The United States Supreme Court granted his first petition for certiorari and remanded the case "for further consideration in light of Simmons v. South Carolina , 512 U.S. 154 (1994)." Mickens v. Virginia, 513 U.S. 922 (1994). On remand the Supreme Court of Virginia concluded that Simmons  mandated a resentencing because "the jury was entitled to be informed of Mickens' parole ineligibility." Mickens v. Commonwealth, 457 S.E.2d 9,

4

10 (Va. 1995). On February 5-8, 1996, the trial court held a new sentencing hearing. The jury again fixed Mickens' sentence at death. Mickens appealed, the Supreme Court of Virginia affirmed the sentence, see Mickens v. Commonwealth, 478 S.E.2d 302, 307 (Va. 1996), and the Supreme Court denied certiorari, see Mickens v. Virginia, 520 U.S. 1269 (1997). Mickens then pursued state post-conviction relief. The Supreme Court of Virginia summarily denied his petition for a writ of habeas corpus on December 15, 1997. Mickens then sought federal habeas corpus relief with the assistance of counsel appointed by the district court.

It was Mickens' federal habeas counsel who first discovered that Mickens' lead trial counsel, Bryan Saunders, labored under a conflict of interest. (The facts about the conflict issue are taken from the findings of the district court in Mickens' federal habeas proceeding.) While investigating Mickens' case, federal habeas counsel went to the Newport News Juvenile and Domestic Relations Court (JDR Court) to review Mickens' JDR file. While there, counsel also asked the clerk on duty for any files involving Timothy Hall. Although juvenile case files are confidential and are not to be disclosed publicly without a court order, see Va. Code Ann. § 16.1-305, the clerk slipped up and produced Hall's file. This file revealed that at the time of Hall's death, Saunders was representing him on assault and concealed weapon charges. The first of these charges originated on February 21, 1992, when Hall's mother swore out a warrant for assault and battery against him. She said that her son had grabbed her by the arms and shoved her to the ground. Hall was booked again around March 13, 1992, when the Newport News police charged him with possession of a concealed weapon (a serrated bread knife wrapped in paper). Hall appeared before the JDR Court on March 20, 1992, when Judge Paul Criver, Jr. appointed Saunders to represent Hall on the two charges. A hearing in the matter was continued to April 3, 1992. Sometime between March 20 and March 28, 1992 (the day Hall was last seen alive), Hall came to Saunders' office for an interview that lasted between fifteen and thirty minutes. They discussed the circumstances surrounding each of the charged crimes.

On Friday, April 3, 1992, four days after Hall's body was discovered, Judge Aundria Foster of the JDR Court dismissed the assault and concealed weapon charges against Hall, noting that he was

5

deceased. Judge Foster's handwritten order was entered on the individual docket sheet for Hall's case. The docket sheet was a single page that included Hall's full name, his date of birth, the charges, an abbreviated history of the proceedings, and the identity of his appointed lawyer, Saunders. That same day Saunders went to the courthouse for the scheduled hearing in Hall's case, and someone (Saunders does not recall whom) told him that Hall was dead and that the case had been dismissed. Mickens was arrested the next day, Saturday, April 4, 1992. On the following Monday, April 6, 1992, Judge Foster -- the same judge who handled the dismissal of Hall's case -- appointed Saunders to represent Mickens in his trial for the capital murder of Hall. Mickens' arrest warrants, which appear to have been before Judge Foster when she appointed Saunders, charged that "on or about March 30, 1992" Mickens murdered "Timothy Jason Hall, white male, age 17, by stabbing, and during the commission of an abduction, and sodomy as well as robbery." Mickens v. Greene, 74 F. Supp. 2d 586, 614 (E.D. Va. 1999). Judge Foster did not make any inquiry into whether Saunders would have a conflict in representing Mickens.

Following his appointment, Saunders represented Mickens at the guilt phase of his murder trial and at both of his sentencings. Saunders worked with court-appointed co-counsel, Warren Keeling, but Saunders was responsible for about ninety percent of the workload. Keeling did take the lead at the sentencings. Neither Saunders nor Keeling represented Mickens on his state habeas petition. Saunders never told Mickens (or Keeling) that he had represented Hall, and Mickens did not learn about it until federal habeas counsel saw Hall's JDR file.

On June 25, 1998, Mickens filed a petition in federal court for a writ of habeas corpus under 28 U.S.C. § 2254. The district court denied the petition. That court rejected the conflict of interest claim after concluding that "the possible conflict of interest presented by Saunders' successive representation of Hall and Mickens never ripened into an actual conflict nor was Saunders' advocacy impaired thereby." Mickens, 74 F. Supp. 2d at 615. The district court also rejected Mickens' other claims, including those for ineffective assistance of counsel and insufficiency of evidence. Mickens raises several issues on appeal, but he devotes most of his attention to the question

6

of Saunders' conflict of interest. Because Mickens filed his federal habeas petition after the April 24, 1996, enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, we apply 28 U.S.C. § 2254 as amended by AEDPA. See Mueller v. Angelone, 181 F.3d 557, 565-72 (4th Cir.), cert. denied, 120 S. Ct. 37 (1999). We now turn to the issues.

II.

The Sixth Amendment guarantees a defendant in a criminal case the right to effective assistance of counsel, which includes the right to representation that is free of conflicts of interest. See Cuyler v. Sullivan, 446 U.S. 335, 345-50 (1980). Mickens argues that either of the following two circumstances mandates an award of the writ on conflict grounds: (1) the state court failed to inquire into Saunders' conflict of interest when it knew or should have known that a conflict existed, and (2) Saunders labored under an actual conflict of interest that adversely affected his representation. Conflicts claims present "mixed questions of law and fact that we review de novo." See Williams v. French, 146 F.3d 203, 212 (4th Cir. 1998) (citing Sullivan, 446 U.S. at 342), cert. denied, 525 U.S. 1155 (1999). Of course, the district court's underlying factual findings "are subject to the clearly erroneous standard set forth in Rule 52(a), Fed. R. Civ. P." Fields v. Attorney General, 956 F.2d 1290, 1297 n.18 (4th Cir. 1992).

A.

Before we examine the merits of Mickens' conflicts claim, we address the Commonwealth's argument that this claim is barred under the requirement for exhaustion and the doctrine of procedural default. The exhaustion doctrine bars a claim if it is raised for the first time in a federal habeas petition. See Breard v. Pruett, 134 F.3d 615, 619 (4th Cir.) (citing Matthews v. Evatt, 105 F.3d 907, 911 (4th Cir. 1997)), cert. denied, 523 U.S. 371 (1998). The procedural default doctrine bars a claim when the habeas petitioner"fails to exhaust available state remedies and `the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" Id. (quoting Coleman v. Thompson, 501 U.S. 722, 735 n.1 (1991)).

7

A petitioner may overcome both the exhaustion and procedural default bars by showing cause and actual prejudice. See Breard, 134 F.3d at 620. A petitioner can establish cause by showing "that the factual basis for [the] claim was unavailable to him at the time he filed his state habeas petition." Id. See also McCleskey v. Zant, 499 U.S. 467, 493-94 (1991); Williams, 146 F.3d at 209. The district court concluded that Mickens established cause: "Here, Saunders' silence and state law requirements for secrecy of juvenile court records operated together to preclude Mickens from raising the conflict of interest claims in his state habeas petition." Mickens , 74 F. Supp. 2d at 600. Juvenile files are confidential and may not be produced without court order. See Va. Code Ann. § 16.1-305. The Commonwealth nevertheless argues that if federal habeas counsel was able to discover the facts behind the conflicts claim, then Mickens could have done the same thing when he was developing his claims on state habeas. We disagree. As the district court found, "the fortuitous circumstances by which federal habeas counsel discovered the truth about Saunders' conflict prove beyond question that Mickens did not fail in his duty to inquire in the state court proceedings." Mickens, 74 F. Supp. 2d at 601 (citing Amadeo v. Zant, 486 U.S. 214, 224 (1988)). It was only through a clerk's mistake that federal habeas counsel saw Hall's JDR file, and as soon as a supervisor discovered the error, the file was taken from federal habeas counsel. Under these circumstances, we agree with the district court that "the factual predicate for [the conflicts claim] was not available to Mickens in state court nor was it discoverable through the exercise of diligent investigation." Mickens, 74 F. Supp. 2d at 602. Mickens has established cause.

To establish prejudice to excuse his default, a petitioner must show that his counsel's error "worked to his actual and substantial disadvantage," not merely that the error "created a possibility of prejudice." United States v. Frady, 456 U.S. 152, 170 (1982) (emphasis omitted). In conflict of interest cases prejudice is presumed once a petitioner establishes the merits of the underlying claim. See Sullivan, 446 U.S. at 349-50; Wood v. Georgia, 450 U.S. 260, 273-74 (1981). Our prejudice inquiry in this case thus incorporates the test for establishing the underlying conflict of interest claim. See Williams, 146 F.3d at 212-13 (analyzing actual prejudice by examining the merits of petitioner's conflict of interest claim); Rosenwald v. United States, 898 F.2d 585, 587 (7th Cir. 1990) (concluding that to show actual prejudice the peti-

8

tioner must establish the merits of his <u>Sullivan</u> claim). This means that we proceed directly to the merits of Mickens' conflict of interest claim.

B.

Mickens' first conflict argument is that he must be retried for the following reason: the state judge who appointed Saunders to represent him on the capital murder charge conducted no inquiry even though the judge knew or should have known that Saunders' back-to-back representation of the murder victim and the accused would present a conflict. As a general rule, to establish ineffective assistance of counsel, a petitioner must show (1) objectively unreasonable performance and (2) prejudice. <u>See Strickland v. Washington</u>, 466 U.S. 668, 687 (1984). A different test applies when there is a conflict of interest claim: "In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." <u>Sullivan</u>, 446 U.S. at 348. As we have said, "[w]hen counsel for a defendant in a criminal case has an actual conflict of interest . . . and the conflict adversely affects counsel's performance in the defense of the defendant, prejudice to the defense is presumed and a new trial must be ordered." <u>United States v. Tatum</u>, 943 F.2d 370, 375 (4th Cir. 1991) (citing <u>Sullivan</u>, 446 U.S. at 348-50).

There is a circumstance where a showing of adverse effect is not required, according to <u>Wood v. Georgia</u>, 450 U.S. 260 (1981). We have described that circumstance as follows: "In <u>Wood v. Georgia</u>, the Court flatly stated that a <u>conflict situation</u> which is not addressed by the trial court requires reversal . . . `when the trial court has failed to make an inquiry even though it knows or reasonably should know that a particular conflict exists.'" <u>Tatum</u>, 943 F.2d at 379 (emphasis added, internal citation omitted) (quoting <u>Wood</u>, 450 U.S. at 272 n.18 (internal quotation marks omitted)). The Supreme Court decided <u>Wood</u> on conflict of interest grounds even though neither party had raised the conflict issue. <u>See Wood</u>, 450 U.S. at 265 n.4. The Court concluded that "the record . . . demonstrate[d] that the <u>possibility</u> of a conflict of interest was sufficiently apparent at the time of the [probation] revocation hearing to impose upon the[state] court a duty to inquire further." <u>Id.</u> at 272. However, the Supreme Court could not

9

"determine whether an actual conflict of interest was present, especially without the benefit of briefing and argument." Id. Accordingly, the Court ordered that the case be returned to the state trial court for "a hearing to determine whether the conflict of interest that th[e] record strongly suggest[ed] actually existed at the time of the probation revocation or earlier." Id. at 273. Significantly, the Wood Court only asked the state court to determine whether there was an actual conflict; it did not require an additional finding of adverse effect. The Supreme Court specifically instructed the state court that if it found "an actual conflict of interest" and "no valid waiver of the right to independent counsel," "it must hold a new . . . hearing that is untainted by a legal representative serving conflicting interests." Id. at 273-74. Accordingly, to prevail under Wood a petitioner must establish that (1) the trial court failed to inquire even though it knew or reasonably should have known about an apparent conflict, see id. at 272; Tatum, 943 F.2d at 379, (2) there"was no valid waiver of the right to independent counsel," Wood, 450 U.S. at 274, and (3) counsel had "an actual conflict of interest," id. at 273. Under Wood once a petitioner makes this showing, prejudice is presumed, and the petitioner is entitled to a new trial with conflict-free counsel. See id. at 273-74.

Wood places a special responsibility on trial courts to police situations that present apparent conflicts. As we have said, "[w]hen the risk of a conflict of interest is brought to the attention of the trial court . . . the court has the responsibility to investigate further, to advise the defendant personally, and to receive a knowing waiver if that is the expressed wish of the defendant." Tatum, 942 F.3d at 379. If a court fails to initiate an inquiry when it knew or reasonably should have known of an apparent conflict, it has not carried out its responsibility. Careful attention to conflicts is essential to protecting a defendant's Sixth Amendment right to counsel: "'Upon the trial judge rests the duty of seeing that the trial is conducted with solicitude for the essential rights of the accused. . . . The trial court should protect the right of an accused to have the assistance of counsel.'" Holloway v. Arkansas, 435 U.S. 475, 484 (1978) (quoting Glasser v. United States, 315 U.S. 60, 71 (1942)), quoted in Tatum, 942 F.3d at 379. This includes protecting the defendant's right to a lawyer who is free of conflicts. A trial judge's immediate attention to obvious conflicts is also important to maintain the integrity of, and public respect for, the justice sys-

10

tem. See Wheat v. United States, 486 U.S. 153, 160 (1988) (noting that "courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them"). Wood supports these principles by encouraging (in a practical way) trial judges to deal promptly with apparent conflicts: the case dispenses with the requirement to show adverse effect when a judge should have inquired, yet failed to do so, thus making it somewhat easier to obtain a new trial.[1]

_____

[1] Despite the dissent's suggestion, see post at 24, we do not read Wood as overruling Sullivan by implication when we point out that Wood does not require a defendant to show adverse effect if the trial judge has failed to inquire into an apparent conflict. Because Sullivan and Wood addressed circumstances that are quite different, the two cases are easily harmonized. In Sullivan the trial judge had no duty to inquire because the defendant did not object to multiple representation and there was simply "the mere possibility of a conflict." Sullivan, 446 U.S. at 345, 347. In this context, when the trial court has no duty of inquiry, the Supreme Court requires a defendant to "demonstrate that an actual conflict of interest adversely affected his lawyer's performance." Sullivan, 446 U.S. at 348. Sullivan, however, was careful to point out that a trial court must "initiate an inquiry" when it "knows or reasonably should know that a particular conflict exists." Id. at 347. But Sullivan did not articulate the defendant's burden when the trial court fails to fulfill a clear duty to inquire. That was left open for Wood. In Wood the record reflected much more than the "mere possibility" of a conflict. Rather, the state trial judge was faced with an apparent conflict -- one that was clearly suggested by the circumstances. Because there was an apparent conflict, Wood held that the trial judge had a constitutional duty to inquire. See Wood, 450 U.S. at 272. The failure to fulfill this duty carries a definite consequence, as the Court's remand order establishes:

> [The state] court should hold a hearing to determine whether the conflict of interest that this record strongly suggests actually existed at the time of the probation revocation or earlier. If the court finds that an actual conflict of interest existed at that time, and that there was no valid waiver of the right to independent counsel, it must hold a new revocation hearing that is untainted by a legal representative serving conflicting interests.

Id. at 273-74. This is not "shorthand for[Sullivan's] two-part test," see post at 25; rather, the requirement for showing adverse effect is clearly omitted.

11

Mickens meets the <u>Wood</u> test. First, the district court concluded that Judge Foster "knew, or should have know[n]" of the "apparent possible conflict." <u>Mickens</u>, 74 F. Supp. 2d at 613-15. On April 3, 1992, Judge Foster dismissed the charges against Timothy Hall due to his death by making a handwritten order on his individual docket sheet. That single-paged docket sheet identified Saunders as Hall's lawyer. "[T]he next business day, Judge Foster appointed Saunders to represent Mickens in the capital murder of Hall." <u>Id.</u> at 614. In addition to these circumstances, "[t]he heinous nature of the crime and the publicity it received make it difficult to accept that the connection would have escaped Judge Foster's notice." <u>Id.</u> And, "the judge was no doubt aware that Mickens faced charges as to which it might be necessary to counter `evidence about the victim and about the impact of the murder on the victim's family,' at least at the penalty phase of the case." <u>Id.</u> (quoting <u>Payne v. Tennessee</u>, 501 U.S. 808, 827 (1991)). These facts and circumstances are sufficient to show that Judge Foster knew or should have known of the apparent conflict. **2** Mickens also did not waive his right to conflict-free counsel. Since he was never informed of the conflict of interest, he had no opportunity to either consider the conflict or to knowingly and intelligently waive his rights. As we discuss next, Mickens establishes an actual conflict of interest.**3**

_____

Our circuit opinions do not prevent us from applying <u>Wood</u> in Mickens' case, where the state judge was confronted with an apparent conflict. In the Fourth Circuit cases mentioned by the dissent (<u>Gilliam</u>, <u>Beaver</u>, and <u>Tatum</u>), <u>see post</u> at 26-27, we did not conclude that the trial judge had a constitutional duty to inquire. As a result, it was proper to apply <u>Sullivan</u> and not <u>Wood</u>.

**2** The district court concluded that JDR Judge Foster, who handled Mickens' preliminary hearing, "was not relieved of her duty to inquire" into the conflict situation simply because "the trial was to be conducted in another court." <u>Mickens</u>, 74 F. Supp. 2d at 615. The district court was correct. The right to conflict-free counsel arises at the beginning of a case. <u>See Holloway</u>, 435 U.S. at 489-90 (discussing the importance of conflict-free counsel at the pretrial stage).

**3** Mickens also argues that he is entitled to a new trial even without showing an actual conflict. Relief is required, he says, simply because the state judge neglected her duty to inquire into a potential conflict of

12

We begin our analysis of the actual conflict issue by considering Mickens' challenge to the test used by the district court. The district court used a modified version of a test for actual conflict developed by the Eleventh Circuit in <u>Freund v. Butterworth</u>, 165 F.3d 839 (11th Cir.) (en banc), <u>cert. denied</u>, 120 S. Ct. 57 (1999). <u>Freund</u> distinguishes between cases of successive representation (such as Mickens') and cases of simultaneous or multiple representation. The <u>Freund</u> decision requires the petitioner to satisfy a tougher test in a successive representation case: such a petitioner"must show that either (1) counsel's earlier representation . . . was substantially and particularly related to counsel's later representation of petitioner, or (2) counsel actually learned particular confidential information during the prior representation . . . that was relevant to petitioner's later case." <u>Freund</u>, 165 F.3d at 859 (internal quotation marks, emphasis,

_____

interest. He thus seeks relief under what is sometimes called the "automatic reversal rule," which is based on a sentence from <u>Wood</u>: "<u>Sullivan</u> mandates a reversal when the trial court has failed to make an inquiry even though it `knows or reasonably should know that a particular conflict exists.'" <u>Wood</u>, 450 U.S. at 272 n.18 (quoting <u>Sullivan</u>, 446 U.S. at 347). At least one circuit (the Second) applies the automatic reversal rule when a judge who knew or should have known of a possible conflict failed to make an inquiry. <u>See Ciak v. United States</u>, 59 F.3d 296, 298, 307 (2d Cir. 1995) (holding that automatic reversal rule applies to federal habeas cases); <u>United States v. Levy</u>, 25 F.3d 146, 153 (2d Cir. 1994) (stating automatic reversal rule as follows: "When a possible conflict has been entirely ignored, reversal is automatic."). Because, as we will explain, Mickens has shown an actual conflict, we do not decide whether the "automatic reversal rule" should be adopted in this circuit.

The dissent suggests that our application of <u>Wood</u> "is functionally equivalent to the automatic reversal rule." <u>Post</u> at 28. It is not. We are applying <u>Wood</u> in a straightforward way: when the trial court fails to carry out its constitutional duty to inquire into an apparent conflict, the defendant is entitled to a new trial if his counsel labored under an actual conflict. On the other hand, under the automatic reversal rule the defendant gets a new trial when the trial court fails to inquire into "even the possibility" of a conflict. <u>Levy</u>, 25 F.3d at 153. In practice, possible conflicts do not always turn out to be actual conflicts. There is a real difference between the automatic reversal rule and our straight application of <u>Wood</u>.

13

and alterations omitted). Moreover, proof of either of these elements may not be enough, and the petitioner may be called upon to introduce "other proof of inconsistent interests." Id. (internal quotation marks omitted). Recognizing that neither the Supreme Court nor we have ever restricted proof of a conflict to the "two [Freund] scenarios," the district court did modify the test to allow Mickens to meet his burden "through other proof of inconsistent interests . . . if the interests actually diverged." Mickens, 74 F. Supp. 2d at 603 (internal quotation marks omitted).

Even though the district court's modification arguably broadens the Freund test, we decline to adopt that test, even as modified. Neither the Supreme Court nor this court has ever held that a stricter test should apply to a case of successive representation. In our most recent opinion involving successive representation, Burket v. Angelone, 208 F.3d 172 (4th Cir.), cert. denied, 120 S. Ct. 2761 (2000), we neither mentioned Freund nor indicated that successive representation cases should be treated any differently than cases of multiple representation. Instead, Burket reaffirmed that a variety of conflicting interests may infect a lawyer's representation:

> Counsel's "representation of conflicting interests, however, is not always as apparent as when he formally represents two parties who have hostile interests. He may harbor substantial personal interests which conflict with the clear objective of his representation of the client, or his continuing duty to former clients may interfere with his consideration of all facts and options for his current client."

Burket, 208 F.3d at 185 (quoting Tatum , 943 F.2d at 376). To determine whether Sullivan's "actual conflict" requirement is met, we have formulated the following test: "To establish an actual conflict of interest, the petitioner must show that his interests `diverge[d] with respect to a material factual or legal issue or to a course of action.'" Williams, 146 F.3d at 212 (quoting Sullivan, 446 U.S. at 356 n.3 (Marshall, J., concurring in part and dissenting in part)). See also Gilbert v. Moore, 134 F.3d 642, 652 (4th Cir.) (stating same test), cert. denied, 525 U.S. 840 (1998). We adhere to our existing test.

Mickens contends that Saunders labored under one or more actual conflicts of interest. Mickens begins by arguing that his interests

14

diverged from Saunders' because Saunders had a significant personal stake in not revealing his prior representation of Hall. The district court rejected this claim on the basis of Saunders' statements that he saw no conflict of interest and that as far as he was concerned his representation of Hall "[e]nded when I walked into the courtroom and they told me he was dead and the case was gone." We conclude that the district court erred. To begin with, the district court decided to put great weight on Saunders' testimony based on our observation in United States v. Young, 644 F.2d 1008 (4th Cir. 1981), that a court "accords great weight to a lawyer's perception of a conflict" when evaluating a conflicts claim. 644 F.2d at 1014. However, the district court did not consider our next crucial statement that "courts necessarily rely in large measure upon the good faith and good judgment of defense counsel in determining whether an actual conflict of interest exists." Id. (internal quotation marks omitted). The difficulty with placing "great weight" on Saunders' testimony that he did not see a conflict is that the district court repeatedly found that Saunders did not exercise good judgment. See, e.g., Mickens, 74 F. Supp. 2d at 605 (noting that Saunders' view that he had no continuing allegiance to Hall was "remarkably wrong"); id. at 606 (noting that Saunders' failure to disclose his prior representation of Hall was "inexcusable"); id. at 612 n.20 (finding that Saunders' testimony that "he assumed that [his co-counsel] (and everyone else) knew that he had represented Hall . . . lacks evidentiary support and . . . borders on the absurd"); id. at 612 (finding that Saunders had a "myopic view of the potential conflicts and [an] utter insensitivity to the ethical issues raised by the facts"); id. at 605 (stating that "the evidence shows that, regrettably, Saunders never struggled with the ethical issues"); id. at 611 (concluding that Saunders' reasons for failing to pursue investigative leads "are not defensible"). In situations such as this where a lawyer fails to exercise good judgment, courts do not hesitate to disregard a lawyer's testimony that he did not perceive a conflict of interest. See United States v. Swartz, 975 F.2d 1042, 1046-48 (4th Cir. 1992) (rejecting lawyer's statement that he had "[n]o conflict whatsoever" in representing two defendants in same case); Hoffman v. Leeke, 903 F.2d 280, 286 (4th Cir. 1990) (rejecting lawyer's testimony that "he saw no conflict of interest because he thought [his two clients in the same criminal case] would testify to substantially the same facts"); cf. Wheat, 486 U.S. at 163 (holding that a court may disqualify a lawyer

15

who is willing to accept a client's waiver of a conflict of interest and observing "that the willingness of an attorney to obtain such waivers from his clients may bear an inverse relation to the care with which he conveys all the necessary information [about potential problems] to them"). Thus, <u>Young</u> does not establish a rule that courts must always accord great weight to a lawyer's perception about whether an actual conflict exists. Rather, when it is clear that the lawyer lacks good faith or good judgment, his testimony may be disregarded, or at least not be given "great weight." Here, we are not suggesting that Saunders' testimony should have been rejected, but it was certainly not entitled to great weight in light of the district court's several findings that confirmed Saunders' poor judgment.

In any event, because the district court took Saunders' testimony as truthful, so do we. Still, his testimony -- taken at whatever weight -- does not undermine Mickens' argument that there was an actual conflict. As we have repeatedly recognized, a lawyer's personal interests may "conflict with the clear objective of his representation of the client." <u>Burket</u>, 208 F.3d at 185 (quoting <u>Tatum</u>, 943 F.2d at 376). <u>See also Fields</u>, 956 F.2d at 1298-99 (noting that petitioner arguably demonstrated a conflict when his interests diverged from his lawyer's "interest in protecting his own professional reputation and goodstanding"); <u>United States v. Magini</u>, 973 F.2d 261, 264 (4th Cir. 1992). When Saunders undertook the representation of Mickens, it was clearly established that "[d]efense counsel have an ethical obligation to avoid conflicting representations and to advise the court promptly when a conflict of interest arises." <u>Sullivan</u>, 446 U.S. at 346. <u>See also</u> Va. Code Prof'l Responsibility DR5-105(A) (Michie 1992). And, the Virginia Code of Professional Responsibility (as it was called at the time of Mickens' trial) provided that a lawyer had the duty to "explain any circumstances that might cause a client to question his undivided loyalty." Va. Code Prof'l Responsibility EC 5-19 (Michie 1992). As the district court found, "Saunders' representation of the murder victim, at the time of the murder, is undoubtedly a circumstance `that might cause a client to question his undivided loyalty.'" <u>Mickens</u>, F. Supp. 2d at 601. Regardless of whether Saunders believed he could ethically represent Mickens, he was also required to "defer to a client who [held] the contrary belief [by] withdraw[ing] from representation of that client." Va. Code Prof'l Responsibility EC 5-19 (Michie 1992). Saunders thus had the duty to inform both Mick-

16

ens and the court of the prior representation of Hall. If Mickens had objected, Saunders had a related duty to withdraw.

Once Saunders proceeded with the representation of Mickens in these circumstances, he was potentially subject to disciplinary proceedings, which gave rise to an interest in protecting his professional reputation. In other words, Saunders had an interest in preventing his representation of Hall from coming to light. This interest diverged from Mickens' interest in learning about the earlier representation and in making sure he (Mickens) received conflict-free representation. Saunders was thus caught in an actual conflict. See Fields, 956 F.2d at 1298-99 (recognizing potential conflict when client's interest required lawyer "to confess his own negligence or incompetence," but ultimately rejecting claim because once lawyer "frankly admitted [his errors] in open court," "any conflict that might have stemmed from [the lawyer's] interest in protecting his professional standing evaporated"); cf. United States v. Iorizzo, 786 F.2d 52, 58 (2d Cir. 1986) (holding that defendant established conflict of interest claim when lawyer, "solely to protect" his own interest in his professional reputation, decided to forego cross-examination of witness that lawyer had previously represented); Government of the Virgin Islands v. Zepp, 748 F.2d 125, 136 (3d Cir. 1984) (holding that an actual conflict existed when defendant's interests diverged from trial counsel's personal interest in avoiding potential criminal and disciplinary charges for destroying evidence in defendant's case). Saunders' testimony that he did not perceive a conflict may speak to whether the conflict caused an adverse effect, but it does not negate the reality of an actual conflict.

Mickens next contends that an actual conflict existed because Saunders could not investigate Hall, using the confidential information he learned from the young man, without violating the ethical duties that he (Saunders) owed to Hall, his former client. Saunders had a duty to preserve Hall's secrets and confidences even though his employment as Hall's lawyer had ended. See Va. Code Prof'l Responsibility DR 4-101, EC 4-6 (Michie 1992). The Supreme Court has recently reaffirmed the common law rule that a lawyer's duty to protect his client's confidences continues after the client's death. See Swidler & Berlin v. United States, 524 U.S. 399, 410-11 (1998). Saunders also had a duty to zealously represent Mickens. See Va.

17

Code Prof'l Responsibility DR 7-101 (Michie 1992). In representing Mickens, Saunders could not pull his punches in order to protect what he knew about Hall.

The district court applied the Freund test to reject Mickens' conflicts claim on the ground that "Saunders did not learn any confidential information from Hall that was relevant to Mickens' defense either on the merits or at sentencing." Mickens, 74 F. Supp. 2d at 606 (emphasis omitted). The district court erred as a matter of law because it focused too narrowly in describing the circumstance (defense on the merits or at sentencing) where confidential information might be relevant or useful. We have held that an actual conflict can also arise at the investigation and plea negotiation stages of a representation. See Burket, 208 F.3d at 185 ("`[A] failure to act on behalf of a client before trial has representational significance.'" (quoting Tatum, 943 F.2d at 376)); Magini, 973 F.2d at 263 ("A conflict which causes counsel to fail to explore possible plea negotiations may implicate the Sixth Amendment right to counsel."). The proper inquiry, therefore, is whether Saunders' interest (or duty) in maintaining Hall's secrets and confidences diverged from Mickens' interest in pursuing a course of action, specifically, a reasonable pretrial investigation. See Williams, 146 F.3d at 212. Here, the divergence of interests was sufficient to create a second actual conflict.

The district court found that Saunders learned the following information through his representation of Hall: "(a) Hall had been charged with carrying a concealed weapon at the intersection of 27th Street and Marshall in Newport News; (b) Hall's mother had pressed charges against him for assault . . .; and (c) Hall was not living with his mother at the time of his death." Mickens , 74 F. Supp. 2d at 606. The district court also found that Saunders met with Hall for fifteen to thirty minutes and that they discussed "the circumstances surrounding each of the charged crimes." Id. at 599. Finally, the district court acknowledged that Saunders obtained confidential information from Hall. Id. at 606. Saunders thus learned "confidences" and "secrets" in his representation of Hall that he (Saunders) was bound not to reveal. See Va. Code Prof'l Responsibility DR 4-101 (Michie 1992); Commonwealth v. Edwards, 370 S.E.2d 296, 301 (Va. 1988). Moreover, under Virginia law even the charges against Hall were confidential because they were in Hall's juvenile court records which cannot be

18

opened to those outside the juvenile court system without a court order. See Va. Stat. Ann. § 16.1-305.

Juxtaposed to Saunders' duty to remain loyal to Hall by maintaining his confidences and secrets was a duty he owed to his new client, Mickens. As illustrated by the American Bar Association's standards, Saunders had the duty to conduct a thorough pretrial investigation for Mickens: "Defense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction." ABA Standards for Criminal Justice Standard 4-4.1(a) (3d ed. 1993). The Supreme Court and our circuit have recognized the ABA standards as "guides to determining what is reasonable." Strickland, 466 U.S. at 688, quoted in Jones v. Murray, 947 F.2d 1106, 1110 (4th Cir. 1991). Saunders did not investigate (or attempt to develop) any negative information about Hall, the victim of the crime Mickens allegedly committed. Yet the circumstances of this crime (murder and sodomy) suggested that some consideration had to be given to investigating the character and background of the victim. There were no witnesses to Hall's murder, which occurred in a secluded area that was a "known gathering place for homosexuals," Mickens, 74 F. Supp. 2d at 607. Saunders knew from his representation of Hall that Hall had some tendency to violence or aggressiveness and that for some reason he was no longer living at home, despite his young age. This information, together with the notable location of Hall's murder, at least suggested an investigation into whether consent to the sodomy and self-defense to the murder might be defenses or statutory mitigators. In other words, the negative information Saunders had about Hall had the potential to lead to information about the circumstances of the crime. Indeed, the district court recognized that "a reasonable investigation would have included an examination of Hall's past." Id. at 610. Nevertheless, the district court did not see a problem. The court concluded that the confidential information Saunders had about Hall did not create an actual conflict because it "was irrelevant to Mickens' defense" since he denied committing the crime. Id. at 606. This analysis misses the mark because a lawyer has an initial duty to investigate and to make his own, independent appraisal of the case. See ABA Standards for Criminal Justice Standard 4-4.1(a). Of course, obvious avenues of investigation do not always lead to relevant evidence or viable defenses. The point is that

19

reasonable areas of investigation must be considered and pursued. Because of Saunders' duty to protect Hall's secrets and confidences, he could not even <u>consider</u> an investigation that was suggested by the circumstances. <u>See Tatum</u>, 943 F.2d at 376 (noting that actual conflict exists when lawyer's "continuing duty to former client[ ] . . . interfere[s] with his <u>consideration</u> of all facts and options for his current client") (emphasis added). We recognize that in its adverse effect inquiry the district court "credit[ed] Saunders' testimony that he did not refrain from taking any actions for Mickens because of his earlier representation of Hall." <u>Mickens</u>, 74 F. Supp. 2d at 612. But that begs the question whether Saunders had an actual conflict in the first place. Saunders' testimony that there was no adverse effect does not address whether Mickens' interests diverged from Saunders' interests in protecting Hall's confidences. Saunders had an actual conflict because he could not even consider an investigation into Hall's character or background, using as a starting point the information he had about the circumstances of the crimes charged against Hall.

Saunders' duty to conduct a reasonable investigation created still another conflicting interest. Because this was a capital case, there was a good chance that someone from the victim's family (perhaps Hall's mother) would testify during the penalty phase. <u>See</u> Va. Stat. Ann. § 19.2-264.4 (Michie 1992); <u>Payne v. Tennessee</u>, 501 U.S. 808, 827 (1991); <u>Mickens</u>, 74 F. Supp. 2d at 614. Again, there is a duty to "explore all avenues leading to facts relevant to . . . the penalty." <u>ABA Standards for Criminal Justice</u> Standard 4-4.1(a). Surely this would require defense counsel to consider investigating the victim's relationship with key family members, especially (in this case) the victim's mother since the victim was a juvenile. Here, Saunders, while he represented Hall, learned something about his relationship with his mother and about the fact that he no longer lived at home. In particular, Saunders learned about the circumstances leading to the charge that Hall had "grabbed [his mother] by the arms and shoved her to the ground" shortly before his death. <u>Mickens</u>, 74 F. Supp. 2d at 599. This confidential or secret information that Saunders had about some aspects of Hall's relationship with his mother also created a conflict: Saunders' interest in preserving Hall's confidences diverged from Mickens' interest in having Saunders consider an investigation into Hall's relationship with his mother.

20

In sum, Mickens must be afforded a new trial because of the conflict of interest problem. He has shown that (1) the state judge failed to inquire into an apparent conflict that she knew or reasonably should have known existed, (2) he did not waive any conflict, and (3) his lawyer, Saunders, had an actual conflict of interest. This is sufficient under Wood v. Georgia to establish the merits of his claim that he was deprived of his Sixth Amendment right to representation that is free of conflicts of interest. Prejudice is therefore presumed, and Mickens is entitled to a new trial.**4**

III.

Mickens next argues that the district court erred in rejecting his claims for ineffective assistance of counsel based on his trial counsels' inadequate pretrial investigation and failure to request a psychiatric evaluation for the resentencing. The first of these claims is that counsel were ineffective because they failed to investigate (or to request an investigator) for the purpose of gathering evidence for a consent defense and for use in mitigation at sentencing. The district court held that Mickens' claims of inadequate investigation were defaulted because he had not fairly presented them to the Virginia courts. See Matthews v. Evatt, 105 F.3d 907, 911 (4th Cir. 1997). We agree with the district court. See Mickens, 74 F. Supp. 2d at 598.

Mickens' second ineffective assistance claim focuses on counsels' failure to obtain a mental health expert to perform an evaluation for the resentencing. The district court rejected this argument on the merits. On appeal Mickens has not shown us what a mental health expert would have discovered beyond what counsel already knew at the time of the resentencing. Moreover, this claim was also adjudicated against Mickens on the merits in state court. See Williams v. Taylor, 120 S. Ct. 1495, 1516 (2000) ("The relevant provision, 28 U.S.C. § 2254(d)(1) (1994 ed., Supp. III), prohibits a federal court from granting an application for a writ of habeas corpus with respect to a claim adjudicated on the merits in state court unless that adjudication

_____

**4** Mickens also argues that he is entitled to relief under a straightforward application of the Sullivan test, that is, he has shown both actual conflict and adverse effect. Because the presence of an actual conflict is sufficient to presume prejudice in the circumstances of this case, we need not consider the question of adverse effect.

21

`resulted in a decision that was contrary to, or unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." (quoting 28 U.S.C. § 2254(d)(1))). We also reject this claim.

IV.

Mickens argues that the evidence was insufficient to prove attempted forcible sodomy. He further contends that absent sufficient proof of the underlying predicate offense, the capital murder conviction cannot stand. The district court concluded that this claim was defaulted because it was not fairly presented to the state courts. See Matthews, 105 F.3d at 911. Again, we agree with the district court. See Mickens, 74 F. Supp. 2d at 597.

V.

In his reply brief Mickens raises the argument that the ineffective assistance of his state habeas counsel excuses the default of additional ineffective assistance of counsel claims raised for the first time in his federal habeas petition. We have held that ineffective assistance by state habeas counsel fails to establish cause, see Mackall v. Angelone, 131 F.3d 442, 449 (4th Cir. 1997) (en banc) ("Because [petitioner] has no right to effective assistance of counsel in his state habeas proceedings, he cannot demonstrate cause to excuse the procedural default of his claims that his trial and appellate counsel were constitutionally ineffective."), cert. denied, 522 U.S. 1100 (1998), and the district court held the additional claims defaulted on this ground. We adopt the district court's analysis on this issue. See Mickens, 74 F. Supp. 2d at 595.

VI.

A certificate of appealability is issued. The judgment of the district court is reversed because Walter Mickens' lead trial counsel had a conflict of interest that the judge appointing counsel failed to look into. On remand the district court will grant the writ of habeas corpus unless the Commonwealth of Virginia retries Mickens within 180 days of the issuance of our mandate.

REVERSED

22

WIDENER, Circuit Judge, dissenting:

I respectfully dissent. Because Mickens has failed to establish that his attorney's conflict of interest adversely affected his representation, I would affirm the decision of the district court and deny Mickens' petition for habeas corpus relief.

I.

I accept, for the purposes of argument, the majority's conclusion that Mickens' attorney labored under an actual conflict of interest. I must disagree, however, with the majority's conclusion that the Supreme Court's decision in Wood v. Georgia, 450 U.S. 261 (1981), relieves Mickens from his burden of establishing that his attorney's conflict of interest adversely affected his representation.

As the majority has noted, a criminal defendant's Sixth Amendment right to effective assistance of counsel includes a right to counsel unhindered by conflicts of interest. Wood , 450 U.S. at 271; United States v. Tatum, 943 F.2d 370, 375 (4th Cir. 1991). The general standard for ineffective assistance of counsel has most clearly been articulated by the Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984). To prevail, a petitioner alleging ineffective assistance of counsel must establish, (1) that his attorney's representation fell below an objectively reasonable performance and (2) that the inadequate performance prejudiced the petitioner's case. Strickland, 466 U.S. at 687. To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. This constitutional standard for establishing ineffective assistance of counsel applies equally in collateral habeas corpus proceedings as it does on direct appeal. Strickland, 466 U.S. at 697.

Even as it clarified the applicable standard for ineffective assistance of counsel, however, the Strickland Court harmonized existing case law and noted exceptions to the new standard it articulated, recognizing special circumstances addressed by its prior decisions. The Strickland Court recognized that a claim of ineffective assistance of counsel predicated on a defense attorney's conflict of interest presents

23

a special case. Strickland, 466 U.S. at 692. To establish ineffective assistance of counsel predicated on a conflict of interest a defendant must establish only that (1) his attorney labored under an actual conflict of interest that (2) adversely affected the representation. See Cuyler v. Sullivan, 446 U.S. 335, 348 (1980). After a defendant satisfies this two-part test, prejudice is presumed and a defendant need not show that the conflict altered the outcome of the proceeding. Sullivan, 466 U.S. at 349-50.

In Wood, the Court addressed a conflict of interest issue apparent on the face of the record even though the conflict had not been addressed below. Wood, 450 U.S. at 262-63. Because the case arose as an appeal from a revocation of probation, the Court analyzed the conflict under due process, rather than Sixth Amendment grounds. Wood, 450 U.S. at 271-72. Nonetheless, the Court cited Sullivan for the proposition that the Sixth Amendment ensures a right to counsel free from conflict of interest. Wood, 450 U.S. at 271. Without the benefit of briefing, the Court could not determine whether counsel labored under an actual conflict of interest. Wood, 450 U.S. at 272. The record was adequate to establish, however, "that the possibility of a conflict of interest was sufficiently apparent at the time of the revocation hearing to impose upon the [trial] court a duty to inquire further." Wood, 450 U.S. at 272. The Wood Court thus clarified that trial courts have an obligation to inquire into potential conflicts of interest when they know or reasonably should know of a conflict.

The Supreme Court remanded the case and instructed the trial court "to determine whether the conflict of interest that this record strongly suggests actually existed" but did not expressly instruct the trial court to identify an adverse effect. Wood, 450 U.S. at 273. The majority concludes that, because the Wood Court did not expressly require the trial court to identify an adverse effect on remand, a defendant need not establish an adverse effect when a trial court had a duty to inquire into a conflict of interest but fails to do so. Thus, the majority reads Wood to have overruled the second part of Sullivan's two-part standard by implication. "Overruling by implication is not favored." Catawba Indian Tribe of South Carolina v. South Carolina, 978 F.2d 1334, 1347 (4th Cir. 1992).

At the risk of self-immolation, I should say that the decision in Wood, to me, has not turned out to be a model of clarity. The Wood

24

Court was concerned about the potential conflict of interest faced by a defense attorney hired and compensated by the defendants' employer whose interests appeared to diverge from their own. Wood, 450 U.S. at 269-71. The Court cited Sullivan for the proposition that a defendant's right to effective counsel includes a right to "representation that is free from conflicts of interest." Wood, 450 U.S. at 271. The Court then noted that "[o]n the record before us, we cannot be sure whether counsel was influenced in his basic strategic decisions by the interests of the employer who hired him." Wood, 450 U.S. at 272 (emphasis added). If the defendants' attorney had been so influenced, the Court ruled, "the due process rights of petitioners were not respected." Wood, 450 U.S. at 272. That language may only mean that the Court required not just an actual conflict, but also an indication that the conflict adversely affected the counsel's basic strategic decisions. When read in this light, the Wood Court's terse instruction to the trial court on remand does not bear the Constitutional weight the majority ascribes to it. As this court has recognized, the two requirements of the Sullivan test, "an actual conflict of interest resulting in an adverse effect on counsel's performance, are often intertwined, making the factual analyses of them overlap." United States v. Tatum 943 F.2d 370, 375 (4th Cir. 1991). Thus, the Wood Court's instruction to the trial court amounts to no more than shorthand for an explicit two part test that the Wood Court did not even have occasion to quote in its majority decision much less to overrule. Indeed, subsequent to Wood, found in 450 U.S. 261, the holding of Sullivan was underscored by its citation in Strickland: "Prejudice is presumed only if the defendant demonstrates that counsel `actively represented conflicting interests' and that `an actual conflict of interest adversely affected his lawyer's performance.'" Strickland, 466 U.S. at 692 (quoting Sullivan, 446 U.S. at 348).

Only in extraordinary circumstances not present here has the Supreme Court reversed a conviction because of an actual conflict of interest without a determination that the conflict of interest adversely affected the representation. The only occasions I have found in which the Supreme Court has not inquired into an adverse effect are those cases in which a defense attorney objected to the conflict of interest and the trial court nonetheless declined to address the conflict. In such a case, the Supreme Court has held, reversal is required without

25

inquiry into either actual conflict or adverse effect. See <u>Holloway v. Arkansas</u>, 435 U.S. 475, 488-89 (1978).

The majority decision is also contrary to this court's interpretation of <u>Wood</u>. In <u>United States v. Gilliam</u>, 975 F.2d 1050 (4th Cir. 1992), this court addressed <u>Wood</u> without concluding, as does the majority here, that the Supreme Court had partially overruled <u>Sullivan</u>. In <u>Gilliam</u>, the defendant did not raise the issue of conflict resulting from multiple representation until he obtained new counsel at the sentencing phase of his trial and, as a result of his delay, the trial court declined to conduct a hearing into the possibility of conflict. <u>Gilliam</u>, 975 F.2d at 1054. On appeal, this court concluded that the defendant had alleged an actual conflict and noted that "if the court is aware, or should be aware, of a particular conflict, it should conduct a sua sponte inquiry into its existence." <u>Gilliam</u>, 975 F.2d at 1053 (quoting <u>United States v. Akinseye</u>, 802 F.2d 740, 744 (4th Cir.1986)). Without citing <u>Wood</u>, the court held that "failure of the court to make inquiry under Rule 44(c) is not, standing alone, sufficient to require reversal of a conviction" and remanded to the district court to conduct a hearing into the conflict. <u>Gilliam</u>, 975 F.2d at 1053-54. The court cited the <u>Sullivan</u> two-part test as the applicable standard. See <u>Gilliam</u>, 975 F.2d at 1054 n.5. Rather than reverse, this court remanded, noting that "we do not mean to dictate the result to be reached by the lower court" on remand, and left open the possibility that the district court might deny the claim on the grounds that there was "no suggestion that the alleged conflict <u>impaired the ability of counsel</u> to present the case to the jury." <u>Gilliam</u>, 975 F.2d at 1054 (emphasis added).

Again, in <u>Beaver v. Thompson</u>, this court noted that "[t]o prevail on a claim of conflict of interest, Beaver must present convincing evidence of an actual conflict and a resulting adverse effect on performance." 93 F.3d 1186, 1192 (4th Cir. 1996). This court applied the two-part <u>Sullivan</u> test without citing <u>Wood</u> in a case where the defense attorney was a part-time prosecutor for the neighboring county and where the local trial court would presumably have been aware of the potential conflict.

The majority relies on language in <u>United States v. Tatum</u> that "[i]n <u>Wood v. Georgia</u>, the Court flatly stated that a conflict situation which is not addressed by the trial court requires reversal." <u>Tatum</u>,

26

943 F.2d at 379 (citations omitted). The Tatum court cited Wood in response to an argument, raised by the government and accepted by the district court, that the court's review of the conflict of interest issue was premature because facts of record had not yet been developed. Tatum, 943 F.2d at 379. The implication was that the defendant would be free to raise the issue on collateral habeas corpus review rather than on direct appeal. Nonetheless, the Tatum court cited the two-part test of Sullivan as the applicable standard. Tatum, 943 F.2d at 375. The court then applied the test concluding that "known facts lead inevitably to the conclusion that [defendant's counsel] had unacceptable conflicts of interest" and "that pretrial strategies were adversely affected by those conflicts." Tatum, 943 F.2d at 380 (emphasis added). The court concluded that when, as in the case before it, "the record supports these conclusions, we may confront the issue on direct appeal." Tatum, 943 F.2d at 380 (citing Wood, 450 U.S. at 272). Thus, contrary to the majority's holding, Tatum expressly upheld and applied the Sullivan two-part test and cited Wood for the more narrow jurisdictional point that this court could appropriately address the conflict of interest issue on direct appeal.

II.

Mickens asserts that, when a trial court has failed to inquire into a potential conflict even though it knew or should have known of the conflict, footnote 18 of the Wood decision requires automatic reversal without any inquiry into the existence of either an actual conflict or an adverse effect. See, e.g., United States v. Levy, 25 F.3d 146, 153 (2nd Cir. 1994); Unites States v. Burney, 756 F.2d 787, 791 (10th Cir. 1985). The relevant footnote states that "Sullivan mandates a reversal when the trial court has failed to make an inquiry even though it `knows or reasonably should know that a particular conflict exists.'" Wood, 450 U.S. at 273 n.18 (internal quote from Sullivan, 446 U.S. at 347).

The majority declines to reach Mickens' argument about footnote 18 because it concludes he has identified an actual conflict and that the Wood Court's instruction to the trial court on remand eliminates the requirement of an adverse effect. See Majority opinion at 13 n.3. On its face, the majority's rule is distinct from the automatic reversal rule in that it requires a reviewing court to find that an actual conflict

27

of interest existed before it may reverse a conviction. See Majority opinion at 10. In practice, however, the rule adopted by the majority, which eliminates the adverse effect requirement when a trial court fails to inquire into a conflict about which it should have known, is functionally equivalent to the automatic reversal rule.

In the absence of an objection from defense counsel, the trial court need not conduct an inquiry unless it "knows or reasonably should know that a <u>particular</u> conflict exists." <u>Sullivan</u>, 446 U.S. at 347 (emphasis added). In most cases, the same facts that would lead an appellate court applying Mickens' automatic reversal rule to conclude that the trial court should have been aware of a"particular conflict" would also lead a court applying the majority's rule to conclude that an actual conflict existed. Under either rule, the result is reversal of the defendant's conviction. In this case, for example, the majority finds that the trial court should have been aware of the conflict because Mickens faced charges which might require his defense counsel to counter evidence about the victim and the impact of the murder on the victim's family. See majority opinion at 12. By the same token, the majority finds an actual conflict because Mickens' counsel was obligated to investigate and to consider using evidence about the victim to challenge the nature of the crime and the impact of the murder on the victim's family. See majority opinion at 19-20.

For the same reasons that I reject the majority's proposed rule, which requires automatic reversal in practice, I must reject the rule asserted by Mickens, which requires automatic reversal on its face. Despite Mickens' assertions, footnote 18 of <u>Wood</u> can not mean that automatic reversal is required when a trial court fails to inquire into a conflict about which it knew or should have known. That rule would be inconsistent with the manner in which the <u>Wood</u> Court disposed of the case before it. In <u>Wood</u>, the Court ruled that the "possibility of a conflict of interest was sufficiently apparent . . . to impose upon the [trial] court a duty to inquire further" and noted that the trial court had failed to conduct such an inquiry. <u>Wood</u>, 450 U.S. at 272. These holdings satisfy the predicates necessary to trigger the automatic reversal rule asserted by Mickens. Nonetheless, the <u>Wood</u> Court chose to remand the case before it to the trial court for an inquiry into the conflict rather than to reverse the trial court's decision. <u>Wood</u>, 450 U.S. at 273.

28

I should add that the footnote language upon which Mickens relies should be considered as a response by the <u>Wood</u> majority to Justice White's dissent, not an attempt to create a new rule requiring automatic reversal. Justice White argued that the Court did not have jurisdiction to address the conflict of interest apparent from the record because the conflict had not been raised in the courts below. <u>Wood</u>, 450 U.S. at 280. In response, the <u>Wood</u> Court's footnote 18 defended its jurisdiction by indicating that the trial court's failure to conduct an inquiry constituted error under the rule of <u>Sullivan</u> and noting that <u>Sullivan</u> did not prohibit "the raising of a conflict-of-interest problem that is apparent in the record." <u>Wood</u>, 450 U.S. at 273 n.18 (quoting <u>Sullivan</u>, 446 U.S. at 347). Subsequent decisions have cited <u>Wood</u> for this procedural point. See <u>Izumi Seimitsu Kogyo Kabushiki Kaisha v. U.S. Philips Corp.</u>, 510 U.S. 27, 33 (1993); <u>Tatum</u>, 943 F.2d at 380.

III.

Because I disagree with the majority's conclusion that <u>Wood</u> has eliminated the requirement that an actual conflict adversely affect the representation and reject Mickens invitation to adopt the automatic reversal rule, I should address briefly whether Mickens has established an adverse effect in this case.

I note, especially, that the majority decision does not take issue with the finding of the district court that Saunders' conflict of interest caused no adverse effect in the representation of Mickens in this case. A reference to the reported opinion of the district court is instructive. Commencing at 74 F. Supp. 2d, page 606, and continuing to page 613, the district court considered each of Mickens' claims of adverse effect: Saunders' failure to raise a consent defense; failure to investigate or raise any negative information about Hall; failure to engage in meaningful plea negotiations; failure to appraise the sentencing court of Hall's pending charges or strained relationship with his mother; failure to pass along information to his co-counsel; and making a deficient investigation. The district court considered each of these items in great detail, and supported its findings with page and exhibit references from the record. Its findings are largely factual, and the majority does not contend they are clearly erroneous.

The majority correctly states that the existence of a conflict presents a mixed question of law and fact subject to de novo review, <u>Sulli-</u>

29

van, 446 U.S. at 342, and that the district court's factual findings are subject to the clearly erroneous standard. Fields v. Attorney General, 956 F.2d 1290, 1297 n.18 (4th Cir. 1992). However, the adverse effect inquiry, in my view, is so heavily fact dependent that I believe considerable deference must be given to the findings of the district court.

A defendant has established an adverse effect if he proves that his attorney took action on behalf of one client that was necessarily adverse to the defense of another or failed to take action on behalf of one because it would adversely affect another. See Tatum, 943 F.2d at 376. Thus both taking affirmative actions and failing to take actions "that are clearly suggested by the circumstances" can indicate an adverse effect. Tatum, 943 F.2d at 376. Based on our holding in Tatum, I agree with the district court's thoughtful articulation of a three-part standard for showing an adverse effect which, as in any other civil action, Mickens must establish by a preponderance of the evidence. Mickens, 74 F. Supp. 2d at 603-4 (citing Freund v. Butterworth, 165 F.3d 839, 860 (11th Cir. 1999) (en banc)). First, the defendant must identify a plausible alternative defense strategy or tactic that his defense counsel might have pursued. Second the defendant must show that the alternative strategy or tactic was objectively reasonable under the facts of the case. Because prejudice is presumed, the petitioner need not show that the tactic or strategy would have altered the outcome of the trial, rather he must only establish that the alternative "possessed sufficient substance to be a viable alternative." Freund, 165 F.3d at 860. Finally, the defendant must establish that the defense counsel's failure to pursue that strategy or tactic was linked to the actual conflict.

Mickens challenges this standard, arguing that neither this circuit nor the Supreme Court has required a petitioner to establish a link between an adverse effect and an actual conflict. Such a link is implicit, however, in the Supreme Court's requirement that a defendant show that "his counsel actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance." Sullivan, 466 U.S. at 348, 350. As this court has noted, the two requirements, "an actual conflict of interest resulting in an adverse effect on counsel's performance, are often intertwined, mak-

30

ing the factual analyses of them overlap." <u>Tatum</u>, 943 F.2d at 375 (emphasis added).

I conclude that the district court applied the appropriate standard to evaluate the adverse effects asserted by Mickens. Because I agree with the district court that many of Mickens' assertions of adverse effect were not viable defense strategies and that those that were viable defense strategies were not linked to his attorney's conflict of interest, I agree that there was no adverse effect from Saunders' conflict of interest.

IV.

To sum up the case, the rule of <u>Cuyler v. Sullivan</u> is that in order to prevail in a case such as this ". . . a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance." 446 U.S. at 350. That rule was endorsed by the Court explicitly in <u>Strickland v. Washington</u>, 466 U.S. at 692: "Prejudice is presumed only if the defendant demonstrates that . .. `an actual conflict of interest adversely affected his lawyer's performance.'" <u>Sullivan</u> was decided in 1980, and <u>Strickland</u> in 1984. The majority holds that the intervening 1981 case of <u>Wood v. Georgia</u> has changed that rule so that an adverse effect is no longer required. I am of opinion that <u>Wood</u> did not change the <u>Sullivan</u> rule and, for that reason, I respectfully dissent.

31